## STATE v. HANSEN.

No. 2270.   Decided February 23, 1912 (122 Pac. 375).

1. ADULTERY—EVIDENCE—SUFFICIENCY.   Evidence *held* sufficient to support a conviction for adultery, although the testimony of the other party to the crime was weak and contradictory.   She was testifying against accused under an understanding with the juvenile court officers that, unless she did so, she would be committed to the Industrial School, and accused's confession was impeached by his testimony that at the time of the confession he did not understand the meaning of the term "sexual intercourse."   (Page 425.)

2. ADULTERY—CORROBORATION—EVIDENCE.   A confession by accused to an act of adultery other than that in issue does not corroborate the testimony of the woman, although admitted in evidence without objection.   (Page 426.)

3. CRIMINAL LAW—TRIAL—ELECTION.   Where an information charges a single act of adultery, and, before the introduction of evidence, the prosecution does not elect on which act to be shown by the testimony they will rely, the law makes an election by considering the act which the prosecution first introduces testimony to support as the act charged, and no subsequent election can be made.[1]   (Page 427.)

---

[1] State v. Hilberg, 22 Utah, 27, 61 Pac. 215.

4. CRIMINAL LAW—APPEAL—REVIEW—EXISTENCE OF EXCEPTIONS. Where no exception is taken to the overruling of an objection to leading questions, the objection cannot be considered on appeal. (Page 428.)

5. WITNESSES—EXAMINATION—LEADING QUESTIONS. In a prosecution for adultery, where the other party to the crime is not hostile to the prosecution, or in any sense an unwilling witness, leading questions should not be asked. (Page 428.)

6. CRIMINAL LAW—CREDIBILITY—REPUTATION AS TO VERACITY. Testimony that the reputation of another witness for truth and veracity is good, given by a person who admitted that she did not know what people said about the reputation of the witness and only knew what she herself thought, is reversible error, where all the other testimony, including that of the witness whose reputation was involved, tended to show that such reputation was bad. (Page 429.)

7. ADULTERY—EVIDENCE—ADMISSIBILITY. In a prosecution for adultery, testimony that the accused was the first man with whom the woman involved had intercourse was irrelevant, and its admission was prejudicial error. (Page 430.)

APPEAL from District Court, First District; *Hon. W. W. Maughan,* Judge.

Paul Hansen was convicted of adultery and he appeals.

REVERSED WITH DIRECTIONS TO GRANT NEW TRIAL.

*Geo. Q. Rich* for appellant.

*A. R. Barnes,* Attorney-General, and *E. V. Higgins* and *Geo. C. Buckle,* Assistant Attorneys-General, for the State.

STATEMENT OF FACTS.

It is charged in the information that the defendant, a married man, on the 21st day of May, 1910, at Cache County, Utah, committed the crime of adultery by then and there having carnal knowledge of the body of a certain unmarried woman therein named, hereinafter referred to as the prosecutrix. A trial was had which resulted in a verdict of guilty, and the defendant was thereafter sentenced to serve

a term of two years in the state prison. To reverse the judgment the defendant appeals. The evidence relied on by the state to sustain the judgment consists mainly of the evidence of the prosecutrix, who was an accomplice, and certain admissions claimed to have been made by the defendant to the officers who had him in custody after he was arrested for the crime charged. The prosecutrix testified that she had "been out with the defendant three times only"; that the first time she met him was at "an Auditorium dance along the fore part of May," at Logan City, Utah; that she met him again at the same place about May 21, 1910, and danced with him two or three times; that, "after the dance we took my cousin home. . . . We all three got in his buggy, and we first took my cousin home, and then he took me to Providence, and stopped his horse over there, . . . and had sexual intercourse with me." She also testified that the next and only time the defendant again had carnal knowledge of her body was in June, 1910, near her home in the fifth ward of Logan City. Regarding the particular circumstances under which she claims the defendant had illicit intercourse with her at Providence on the occasion mentioned, she testified in part as follows: "Q. What did he do going over? . . . I will ask you whether or not he used both hands all the time in driving? A. No, sir. . . . Q. What did he do? I will ask you whether or not he put his arm around you, one of his arms? A. Yes, sir." The record continues: "(Objected to by the defendant as leading.) The Court: It was leading, but the witness seems to hesitate a long time to answer questions that are not leading. You may proceed." The witness continued: "Q. You said that he put his arm around you? A. Yes, sir. Q. What else did he do? . . . I will ask you whether or not he kissed you? A. Yes, sir." This was objected to as leading, and the court remarked: "It is leading, but it has been answered. Q. What else, if anything, did he do? The Court (addressing the witness): You are asked . . . . what else, if anything, the defendant did? The witness: Nothing. The District Attorney: He put his

arm around you and kissed you, however? The witness: Yes, sir. . . . Q. Now I will ask you to state whether or not after you stopped there he pushed you over? A. Yes, sir. Q. How did he push you over? A. With his hands. Q. And pushed you over, where? A. On the seat. . . . Q. I will ask you to state whether or not he raised up your clothes? A. Yes, sir. Q. I will ask you whether or not he then unbuttoned your pants? A. Yes, sir. Q. I will ask whether or not he then inserted his private parts into your private parts? A. Yes, sir. Q. And had intercourse with you? A. Yes, sir. . . . Q. I will ask you to state whether or not you have ever previous to that time had sexual intercourse with any person? A. Yes, sir. Q. I will ask you whether you had been with any man before that? A. No, sir. Q. I will ask whether you had been with any man before that or boy? A. Yes, sir. Q. What is it? A. Yes, sir. Q. You had been with some one before that had you? A. Yes, sir. Q. Now who had you been with before the 21st? A. Well, I don't remember. Q. Have you had sexual intercourse with any man? A. No, sir. Q. But you had been out with some boys. That is what you mean? A. Yes, sir. Q. But the defendant was the first to have sexual intercourse with you? A. Yes, sir." She also testified: That she again met the defendant in June. That he "drove to Schwartz' place where I was working at that time. We got out of the buggy, . . . went inside of the lot, and sat down on the lawn. . . . He pushed me over, . . . and had sexual intercourse with me." That she had been out with the defendant only three times.

On cross-examination she was asked concerning her testimony given in the case before the committing magistrate and testified as follows: "Q. Now you stated . . . that the defendant was the first man that you had had anything to do with so far as having sexual intercourse with him was concerned. You made a different statement from that in the lower court, did you not? A. Yes, sir. Q. Who did you charge in the lower court as being the first man?

A. Andrew Nelson. Q. You stated in the lower court that Andrew Nelson was the first man that had sexual intercourse with you? A. Yes, sir. Q. And you had known him about a year? A. Yes, sir. . . . Q. You also testified in the lower court that you had been offered some inducement to testify in the case did you not? A. Yes, sir. Q. That the officers of the juvenile court had offered you some inducement to testify against these defendants. You remember testifying to that in the lower court? A. Yes, sir. Q. That they would not send you to the reform school—that was the inducement held out to you? A. Yes, sir. Q. Which particular officer was it that told you that, Mr. King, or Mr. Pederson, or Mr. Hansen, which one? A. I don't remember. . . . Q. You were a ward of the juvenile court? You were at that time? A. Yes, sir. Q. And you are still a ward of the juvenile court? A. Yes, sir. Q. You report about how often to the juvenile court? . . . A. Once every two weeks." Some of the officers of the juvenile court were present at the trial, and one of them, a Mr. King, was a witness in the case, but none of them were called to testify on this point, and no attempt was made to refute the testimony of the prosecutrix regarding the inducements held out to her by these officers to testify against the defendant.

Ezra Eames, a police officer of Logan City, testified that soon after the defendant was arrested for the crime charged he saw him in jail, and that "I asked him what he was in for. He says, 'I guess for being out with the ——— girl.' I asked him if it was the Logan ——— girl. He says, 'Yes.' He said he got acquainted with her down at the Auditorium. He says: 'I didn't know what it was for.' He says: 'What would you do?' I says: 'I don't know what you are in for.' He said . . . he was in for having sexual intercourse. . . . He told me that he took her home from the dance at the Auditorium. He took her out. I says: 'Did you have sexual intercourse with her?' He says, 'Yes.' . . . He says: 'Who is a good attorney?' 'Well,' I say, 'I guess there is my friend Rich is an attorney.' . . . Well, he

asked if I would go over. He asked me twice if I would go over. I found nobody in the office. . . . I telephoned to Mr. Rich, and told him there was a little case. That he was wanted."

James Hansen, a police officer of Logan City, testified that defendant, soon after he was arrested, admitted to him that he had had carnal knowledge of the body of the prosecutrix. Regarding the time and place of the adulterous act referred to by defendant in this alleged confession Hansen testified as follows: "Q. Did he say where he had done it? A. Yes. Q. Where did he state? What did he say further? A. Why, I asked him where this transpired. He said here in the fifth ward. Q. Did he say what place in the fifth ward? A. It was somewhere opposite her home, there." The record shows that the prosecutrix resided and had resided in Logan City all her life; that at the time of her alleged illicit relations with the defendant she was living with and working for a certain family in the fifth ward near her home.

The defendant was sworn as a witness, and testified in his own behalf. He denied that he had had carnal knowledge of the body of the prosecutrix. He admitted that he said to Eames that he had had sexual intercourse with her, but claimed that at the time he made the statement he did not understand the meaning of the term "sexual intercourse"; that he understood the words to mean that he had merely associated with the prosecutrix in a social way by being "out with her"; that he did not intend to nor was he aware at the time that he was confessing to the commission of an immoral or illegal act.

Several witnesses who were and for many years had been residents of Providence, defendant's home town, and who had known him practically all his life, testified that his reputation for virtue and morality was good. No attempt was made to dispute the facts testified to by these witnesses. Much evidence was introduced tending to show that the reputation of the prosecutrix for chastity, morality, truth and veracity was bad in the community where she had resided all

her life. The state called two witnesses to prove that her reputation for truth and veracity in the neighborhood where she resided was good. One of these was the chief probation officer of the juvenile court, and he testified that he had known the prosecutrix for two years, and, so far as he knew, her reputation for truth and veracity was good. On cross-examination he said: "I took her into the juvenile court. I called in her father. . . . I heard her father tell Judge Pederson how the girl had deceived him as to where she stayed out at night. . . . I heard her father tell before Judge Pederson that the girl had lied to him. Q. And yet you say that a person's reputation for truth and veracity is good when that person will lie to her own parent? A. I did." On redirect examination he testified: "I don't know anything about the girl's reputation in regard to her character. I know her father came into the juvenile court, and that he said that she had deceived him as to where she stayed at night. Two or three days before this he came to me and asked me to lock her up. That was on July 26th." The other witness called by the state to prove the good character of the prosecutrix was Mrs. Hannah Jacobson, and she testified: "I have known her (the prosecutrix) since she was four years old. Q. I will ask you to state whether or not you know what her general reputation is in the community where she resides for truth and veracity?" At this point the witness was interrogated by Mr. Rich, defendant's counsel, as to her qualifications to testify regarding the reputation of the prosecutrix, as follows: "Q. Now, you are able to say and testify to this jury what the people generally say of this young lady as to her truthfulness and veracity? A. No; I cannot say that. Q. You could not testify to that? A. I can't testify to what other people say. Q. But you can testify to what you say? A. Yes, sir. Q. But not as to what anybody else says? A. No. Mr. Rich: I object to the question on the ground that the witness is not qualified to testify. District Attorney: Q. You know what her general reputation is, do you not, for truth and veracity? A. Yes, sir; I do. Q. I will ask you to state what her

reputation is in the community where she resides for truth and veracity, good or bad? Mr. Rich: I object to that on the ground that the witness is not qualified on that point. The Court: The witness may answer. Mr. Rich: Exception. District Attorney: What is that general reputation, good or bad? A. Good." On cross-examination she testified: "Q. You say so far as you know the girl's reputation for truth and veracity is good? A. Yes, sir. Q. And at the same time you say you don't know what people say about it? A. No, sir. Q. You don't know what other people may have said? A. No, sir. That is true. I don't pretend to know what people say. It don't make any difference to me."

McCARTY, J. (after stating the facts as above).

One of the grounds relied on for a new trial is that the evidence is insufficient to justify the verdict. The contention made is, first, that the testimony of the accomplice (prosecutrix) was so self-contradictory, and that she was otherwise so thoroughly impeached that the evidence was rendered unworthy of belief; and, second, that her testimony was not sufficiently corroborated to authorize a conviction.

It must be conceded that the testimony of the prosecutrix, when considered in all its phases, including the manner in which it was elicited by the district attorney, was inherently weak. The record shows that she was friendly to the prosecution and was in no sense hostile to the state, and there is nothing in the record indicating that she was friendly to the defendant, yet the district attorney appears to have been unable to elicit any testimony from her of an incriminating character against the defendant, except by leading questions of the most objectionable character indicating the answers expected to be given by her. And, when thus interrogated by the district attorney, she repeatedly, on her examination in chief, made contradictory statements regarding matters material to the issue. As shown by the excerpts, the prosecutrix, in answer to leading questions asked her by the district attorney, testified that the

defendant, on one occasion when it is claimed that the offense charged was committed, first put his arms around her, and then kissed her. She was then asked, first by the district attorney and then by the court, "What else, if anything, did the defendant then do?" This was practically the only question asked the prosecutrix on her direct examination regarding what occurred on that occasion that was not objectionable as leading, and she answered, "Nothing." Furthermore, according to her own testimony, which was not denied, she was at the time of the trial a ward of the juvenile court, and had been given to understand by certain juvenile court officers that, unless she testified against the defendant, she would be committed to the state industrial school. These were all questions which went to the credibility of the witness and the weight of her evidence. And they were questions for the jury to consider under proper instructions from the court in determining what weight, if any, should be given the testimony of the prosecutrix. The jury having found, as indicated by their verdict, that the testimony of the prosecutrix respecting her alleged illicit relations with the defendant at Providence on or about the date charged in the information was true, this court cannot disturb the judgment because of such finding. The question, however, as to whether the testimony of the accomplice was sufficiently corroborated to support the verdict returned by the jury is not as free from doubt as the one we have just decided.

The only corroborative evidence given at the trial "which in itself and without the aid of the testimony of the accomplice tends to connect the defendant with the commission of the crime" as required by Comp. Laws 1907, sec. 4862, is that given by Ezra Eames.

The alleged confession made by the defendant to James Hansen, and mainly relied upon by the state as corroboration of the testimony of the accomplice, cannot be considered, as it related to an entirely separate and distinct transaction from the one for which the defendant was tried and convicted. As we have observed in the foregoing statement of facts, the prosecutrix testified

that the defendant first had carnal knowledge of her body at Providence on or about the 21st day of May, 1910. This was the first act testified to by her. She then testified that the defendant again had sexual intercourse with her near her home in the fifth ward of Logan City, in June, 1910.

The prosecution did not expressly elect as to which adulterous act it would rely upon for a conviction. It was, however, proceeding to introduce evidence to show for the purpose of fixing the venue that Providence, the          **3** place of the first alleged act of intercourse, was within the jurisdiction of the court, and the defense admitted that Providence was in Cache County, Utah. We think it might reasonably be inferred from this that the first act of intercourse testified to by the prosecutrix was the one upon which the state relied for a conviction. The question of election, however, in this case, does not rest upon inference. Under the rule announced by this court in the case of *State v. Hilberg,* 22 Utah, 27, 61 Pac. 215, the prosecution having, for the purpose of securing a conviction, first introduced evidence tending to show that the defendant had illicit intercourse with the prosecutrix at Providence on or about the 21st day of May, 1910, that transaction became the act charged, and the only act for which the defendant could be legally convicted. In the Hilberg Case it is said:

"When evidence was introduced tending directly to the proof of one act, and for the purpose of securing a conviction on it, from that moment that particular act became the act charged. No election having been made by the prosecution, the law made the election. . . . this election having been thus made, by proving the first act of intercourse as having taken place in April, 1897, no subsequent election could be made, nor could the prosecution prove any other act of the kind as a substantial offense upon which conviction could be had; but it could prove the intimacy and improper relations of the parties prior to the act shown in the month of April, 1897, but not afterwards. The act of intercourse occurring April, 1897, being the first act to which evidence was introduced, and the evidence being directly upon the offense charged, it became from that moment the only offense the jury were called upon to try."

It necessarily follows from the doctrine declared in that case, if it is to be followed, and we see no reason for depart-

ing from it, that the evidence of James Hansen regarding the alleged confession made to him by the defendant was immaterial and inadmissible for any purpose. It related to a transaction subsequent to and different from the one for which the defendant was tried and convicted, and did not have any bearing, directly or remotely, upon any issue in the case. No obection was made to the testimony of Hansen at the time it was given, hence error cannot be imputed to the trial court for having admitted it as was done in the Hilberg Case, but, since the judgment is assailed on the ground of insufficiency of the evidence to support it, we can give force and effect to such evidence only as was germane to the issues tried.

The only other evidence tending to corroborate the testimony of the accomplice was that given by the witness Eames. The defendant sought to avoid the effect of this evidence by claiming that at the time he conversed with Eames about his relations with the prosecutrix he did not understand the meaning of the term "sexual intercourse," and supposed that it meant merely intercourse in a social way. And there is evidence in the record that tends strongly to support this claim, and which correspondingly tends to weaken, but does not destroy, the effect of the testimony given by Eames. The question as to whether or not the defendant understood the meaning of the words "sexual intercourse" when he made use of them to Eames on the occasion in question was one of fact for the jury to determine, and the jury having, by their verdict, found against the defendant on that issue, such finding cannot be disturbed because we might, if we were triers of the fact, arrive at a conclusion different from the one reached by the jury.

It is not contended that the court committed prejudicial error in permitting the district attorney to ask the prosecutrix leading questions. Counsel for defendant interposed several objections to questions asked the prosecutrix by the district attorney on the ground that they were leading. No exception having been taken to the action of the 4, 5 court in overruling the objections, we cannot consider

such rulings. In view, however, that the cause must be reversed and remanded for a new trial, we remark that nearly every question asked the prosecutrix by the district attorney concerning a material fact was objectionable as leading, and ought not to have been permitted. It was not shown, nor is it claimed, that the prosecutrix was hostile to the prosecution or in any sense an unwilling witness.

Complaint is made that the court erred in permitting Mrs. Jacobson to testify that the general reputation of the prosecutrix in the community where she resides was good, the witness having shown by her own evidence that she was not qualified to so testify. Timely objections were made to her testimony, but were overruled. This was error. Mrs. Jacobson was the only witness whose evidence tended to show that the general reputation of the prosecutrix for truth in the community where she resided was good. Without her testimony the uncontradicted evidence showed that the reputation of the prosecutrix for truth and veracity was bad. On her direct examination the prosecutrix testified, prior to the time when she first met the defendant, she had sexual intercourse with other parties. Later on in her testimony she asserted that the defendant was the person with whom she first had illicit relations. On cross-examination she was interrogated by the defense and answered as follows: "Q. You stated . . . that this defendant was the first man that you had had anything to do with, so far as having sexual intercourse with him was concerned. You made a different statement from that in the lower court did you not? A. Yes, sir. Q. Who did you charge in the lower court as being the first man? A. Andrew Nelson. Q. You stated in the lower court that Andrew Nelson was the first man that had had sexual intercourse with you? A. Yes, sir. Q. And that you had known him about a year? A. Yes, sir." After the defense had rested, and the evidence was practically all submitted, the prosecutrix was recalled by the prosecution, and was permitted to testify that, when she testified in the lower court that one Nelson was the first person who had sexual

intercourse with her, she did not understand the question. Defendant objected to this evidence on the ground that it was not proper rebuttal, and, further, that the questions propounded to the prosecutrix by the district attorney on this point were leading. The objections were overruled. We think, under the peculiar facts of this case, this was error.

The prosecution of this case seems to have been conducted on the theory that the defendant was being sued for seduction as well as being tried for the adultery. When evidence was introduced on behalf of the state tending to show that the defendant had had adulterous intercourse with the prosecutrix as charged in the information, the prosecution then proceeded to introduce evidence to show that she was first defiled by the defendant. In other words, that he was responsible for the ruin, downfall, and shame of a pure and innocent girl. This evidence did not tend to prove or disprove any fact material to any issue in the case. The only question for the jury to determine, was, Did the defendant, who was admitted to be a married man, have sexual intercourse with the prosecutrix at the time and place alleged in the information? The question as to whether the prosecutrix was first defiled by the defendant or some other person was not germane to any issue in the case, and was therefore wholly immaterial and should have been excluded. That this evidence had its effect on the jury and was prejudicial to the defendant hardly admits of a doubt. This we think is shown by the remarks of the court to the defendant at the time judgment was pronounced. The court said: "This is one of the most serious cases of the kind that has come before the court for a long time owing to the youth of the girl. From her testimony the jury believed that you were the father of her ruin." We do not refer to these remarks in a spirit of criticism, but merely to invite attention to the importance that the state attached to this phase of the proceedings, and the prejudicial effect the evidence in question must have had on the jury.

There are other errors assigned which are based on certain rulings of the court, but as no exceptions were taken to the rulings and in some instances no objections made thereto, we cannot consider them.

The judgment is reversed and the cause remanded, with directions to the trial court to grant a new trial.

FRICK, C. J., and STRAUP, J., concur.