## STATE v. CHYNOWETH.

No. 2356.   Decided July 29, 1912 (126 Pac. 302).

1. WITNESSES—STATEMENTS OUT OF COURT—EFFECT.   What a witness, who is not a party, states out of court is not evidence in chief to prove the fact stated by him, but can only be shown to discredit his testimony.   (Page 362.)

2. CRIMINAL LAW—REVIEW—INSTRUCTIONS.   Failure of the trial court to give an instruction limiting the consideration of impeaching testimony is not assignable as error, where no such instruction was requested.   (Page 362.)

3. CRIMINAL LAW—REVIEW—SUFFICIENCY OF THE EVIDENCE.   In determining the sufficiency of the evidence to sustain a conviction, the Supreme Court can consider only such evidence as bears in some degree upon the issues involving the merits.[1]   (Page 362.)

4. LARCENY—EVIDENCE—SUFFICIENCY.   In a trial for theft of a calf, evidence held insufficient to show that accused knew, or had reason to believe, when he branded the calf, that it was not his property.[2]   (Page 362.)

APPEAL from District Court, Sixth District; *Hon. J. F. Chidester,* Judge.

William Chynoweth was convicted of larceny and he appeals.

REVERSED AND REMANDED.

---

[1] State v. Hansen, 40 Utah, 418, 122 Pac. 375.
[2] State v. Potello, 40 Utah, 56, 119 Pac. 1023.

*W. F. Knox* for appellant.

*A. R. Barnes,* Attorney-General, and *Geo. C. Buckle,* and
*E. V. Higgins,* Assistant Attorneys-General, for the State.

McCARTY, J.

William Chynoweth, the defendant. was tried and convicted
in the district court of Garfield County, Utah, and sentenced
to a term of three years in the state prison. It is alleged
in the information that the defendant, on the 20th day of
October, 1910, in the County of Garfield, State of Utah, did
feloniously steal, take, and drive away one heifer calf, the
property of one Rufus B. Liston. The defendant, in his
assignment of errors, assails the judgment on the ground that
it is not supported by, but is contrary to, the evidence.

Liston, the alleged owner of the calf described in the in-
formation, is, and for many years has been, engaged in farm-
ing and stockraising at Escalante, Garfield County. His
cattle range, winter and summer, upon the public domain in
Garfield County. The defendant and his father, Sampson
Chynoweth, were, at the time this trouble arose, and for
seven or eight years prior thereto had been, engaged as part-
ners in the cattle business at Henrieville, Garfield County.
Their cattle ranged upon the public domain in Garfield and
Kane Counties. The defendant had charge of the cattle and
looked after them while they were at large upon the range.
He attended to the branding of the calves. In the fall of each
year, he would collect together the cows with sucking calves,
separate the calves from the cows, turn the cows loose upon
the range, and drive the calves to Henrieville, and there keep
them inclosed in a pasture until they were weaned. The
evidence for the state tended to show that a roan cow with a
roan heifer calf, the property of Liston, were seen running
at large upon the public domain in Garfield County by sev-
eral parties and at different times covering a period of sev-
eral months in 1910. The calf was first seen in March. At
that time it was with its mother, the cow mentioned, and ap-
peared to be two weeks old. The last time the cow and calf

were seen together running at large upon the range was about the middle of August. The calf at that time was neither branded nor earmarked. The parties, who claimed to have seen the calf with its mother on the occasions referred to, testified that they saw it again about the 17th of October at Henrieville in the defendant's possession, and that his brand and earmark were on it; that the defendant claimed that he had raised the calf; and that it was his property. It is admitted that the defendant kept the calf in his possession in Henrieville with about fifty or sixty other calves for about a month or six weeks, and then turned it onto the winter range with his other calves. In December W. J. Henderson and Myron Willis, two of the parties who claimed to have seen the Liston cow and calf together upon the range during the spring and summer months, went in search of the Liston cow and calf in question. Their object in hunting up these animals was to get evidence upon which to base a charge of grand larceny against the defendant. They found the cow, and put her into a corral with about fifteen head of other cattle. This corral is situated in what is known as Tie Hatch Canyon. The next day they found the calf, and put it into the corral with the cow. They testified that when "the cow got sight of the calf she went up to it and began to smell of it, and followed it around through the corral for a few minutes," but that "the calf did not seem to know her;" that they "took the cow and calf from the corral and drove them back into the pasture (in Tie Hatch Canyon) and left them there, and then went home."

The foregoing, with the exception of some evidence of an impeaching character, to which we shall refer later, is, in substance the state's case.

The defense interposed by the defendant was that he owned the calf; that he had raised it; and that a certain cow of his was its mother. The defendant called as a witness John Pollock, the committing magistrate who bound him over to answer in the district court to the charge set forth in the information. Pollock testified that in the latter part of September, 1910, he was riding the range about six miles south

of Henrieville and saw one of defendant's cows, and that a "long-eared" calf was following the cow—that is, a calf that was neither branded nor earmarked—that the cow and calf were about 150 yards from him; that a few days thereafter he met the defendant and told him that he had seen this cow and calf, and informed him when and where he had seen them. In describing the calf at the trial, the witness said: "It was apparently a dark red calf; that is all I could tell. Of course, it could have been perfectly roan, the distance I was at, and you couldn't detect." About the middle of October, 1910, the defendant, his brother, Harvey Chynoweth, John Willis, and Ernest Mangum were on the range gathering their calves for the purpose of separating them from the cows and weaning them.

John Willis was called as a witness, and testified in part as follows:

"I live in Henrieville, and have lived there for about twenty-four years. I am engaged in farming and raising cattle. I know the calf in controversy. The first time I saw that calf was some time along about the middle of October (1910), . . . about ten miles below Henrieville. We were all gathering up our calves to wean. I ran onto this red cow of Will Chynoweth's (defendant) and a cow and calf of Roan Savage. . . . The calf was with her (defendant's cow) at the time. The two calves had just sucked a few minutes before I found them. They both had wet on their noses. Both cows were giving milk, and as I drove them along both calves followed. Each followed its own mother. . . . We took them to the Slick Rocks corral that forenoon. I got there about noon, and that afternoon we drove them to Horse Valley corral. We had in the neighborhood of about sixty head of cattle altogether. I noticed that that cow and calf stayed together. We put them in the Horse Valley corral and kept them there over night. Next morning we branded the calf and separated it from its mother and took it home. Will Chynoweth (defendant) branded it." On cross-examination the witness said: "When I saw this calf with its mother, it had just sucked. I did not see

it suck; but I could tell that it did so. It had froth (foam) on its nose. When I was driving, it followed the cow along just like any calf follows its mother."

Ernest Mangum testified, so far as material here, as follows: "I saw this calf that this trouble is about in the corral at Henrieville. That was after they had brought the calves up to wean. I first saw it along in the middle of October. . . . Johnny Willis brought this cow and roan calf and put them in the corral at Slick Rock, and then we took them over to Horse Valley corral. . . . When we were driving her, the calf seemed to follow her all the time. The next morning we branded the calf while we had it in the corral. Will Chynoweth branded it in the presence of Johnny Willis, Harvey Chynoweth, and myself. Then we separated the cows and calves and drove the calves over to Henrieville."

Harvey Chynoweth testified that in May, 1910, he and the defendant were moving the defendant's cattle from the winter to the summer range, and that they had the calf in question and its mother, a cow belonging to defendant, in their actual possession for about ten days; that the calf at that time was about three or four weeks old. His testimony regarding the branding of the calf in October was substantially the same as the testimony given by Willis and Mangum on that point.

The defendant testified:

"I first saw this calf in controvesy . . . In May of last year. There was a dark red cow with a brown head with her at that time. That cow belonged to my father and myself. The calf in question was following the cow having our brand. At that time we took the cow and calf to the summer range. We had this cow and calf in our possession about ten days at that time. . . . My brother, Harvey Chynoweth, Ray Twitchell, and George Baldwin were with me at the time. . . . Mr. Henderson was on the range, and he came in with us. . . . We joined herds. Mr. Henderson's boys were with him. I had the roan calf and that cow in my bunch at that time. He cut his cattle out at Pahrea,

a couple of miles from the old town. He had been with us two or three days helping us."

This evidence is not denied. Henderson was the state's main witness, and was in attendance at court during the trial, and was recalled by the state after the defendant gave his testimony, and no attempt was made to contradict the defendant's testimony regarding his possession of the cow and calf on the Pahrea. The testimony of the defendant regarding the branding of the calf was substantially the same as that given by the other witnesses who testified in regard to that transaction.

In the latter part of December, 1910, the defendant and his brother, Harvey Chynoweth, were arrested for the crime charged in the information. Soon after they were arrested, they went in search of the calf in question and also the cow, which they claim is its mother. They employed James E. Smith and Robert Thompson, both of whom were residents of Henrieville, to assist in hunting the cow and the calf. James E. Smith testified that they found the calf in the Tie Hatch Canyon, grazing with some six or seven head of cattle; that the Liston cow was not with the calf, but that later on they saw her at the Blue Trails, which are about two and one-half miles from the canyon in which they found the calf; that they found the cow, which the defendant and several of his witnesses claimed to be the mother of the calf, about thirty miles from Tie Hatch Canyon; that when they took this cow to the place where they were holding the calf with six or seven other cattle "the calf went up to the cow and stood by her—followed the cow around—stayed close to the cow all the time;" that they drove the cow and calf to Henrieville, where they were kept by the defendant on his premises for about two and one-half months. The testimony of the Chynoweths and Robert Thompson on this point is substantially the same as that given by Smith. Pollock, the committing magistrate who bound the defendant over to answer in the district court to the charge of grand larceny, examined the cow and calf after they were brought to Henrieville, and he testified that "in my honest judgment that was the same

cow I saw," referring to the cow that he saw of defendant's in October, with a "long-eared" calf following her. Regarding the calf, he said: "I couldn't tell about the calf, because I had not noticed the calf closely. I would naturally suppose the calf belonged to the cow it was following." Other evidence was introduced by the defendant, which tended to show that his cow was the mother of the calf in question; but we do not deem it necessary to further review the evidence on that point.

It is contended on behalf of the state that the evidence was sufficient to show that the calf in question was the property of Liston, and that it was found in the possession of defendant, and that he failed to make a satisfactory explanation as to how the calf came into his possession. In their brief counsel say:

"Witnesses on behalf of the state, in rebuttal, testified that John Willis had told them that the defendant had, in substance, said to him, 'Now, John, I may be accused of stealing this calf, and I am glad that you are here to testify to its mother,' and that this statement was made at the time the calf was branded."

The witnesses who so testified on rebuttal were W. J. Henderson and W. W. Littlefield. Harvey Chynoweth and Ernest Mangum, who were present and assisted the defendant in the branding of the calf, were asked, on cross-examination by the district attorney, whether they heard the defendant make any such remark to Willis, and each of them answered that he did not. The defendant was also asked, on cross-examination, if he made the remark, and answered, "No, sir." He admitted, however, that he did say to Willis that he was glad that he (Willis) was along to testify to the mothers of the calves, because "there are always some people who will question the ownership of the calves," but denied that any special reference was made to the particular calf in question. The testimony of Mangum and John Willis was to the same effect.

We here remark, parenthetically, that W. J. Henderson, the state's principal witness—the man who was instrumental in starting criminal proceedings against the defendant for

the larceny of the calf—owned about 6000 head of sheep and about 1000 head of cattle, all of which he grazed on the same range upon which the defendant grazed his cattle. The cross-examination of Henderson showed that he entertained feelings of bitter resentment against the defendant. He said in part:

"I have made the threat that I would send this defendant to the penitentiary, if it lay in my power. That is the way I feel about it. And with that feeling in my heart Myron Willis and I went down there to get evidence (referring to their trip to Tie Hatch Canyon hunting for the Liston cow and the calf in question). I tried once before to get evidence to send him to the penitentiary. That was down at Kanab. I have tried ever since."

For the purpose of laying a foundation to discredit the testimony of John Willis, the district attorney asked him, on cross-examination, whether or not, in a certain conversation he had with W. J. Henderson, and in another conversation he had with W. W. Littlefield, he stated that the defendant, at the time he branded the calf, said to him, "Now, John, I may be accused of stealing this calf," etc., and he answered that he made no such statement to either Henderson or Littlefield. As stated by counsel for the state in their brief, Henderson and Littlefield were called on rebuttal, and each of them testified that John Willis, at a certain time and place, stated to him that the defendant, at the time he branded the calf, remarked, "John, I may be accused of stealing this calf," etc. The legal effect of this impeaching evidence was to discredit the testimony of Willis. It did not tend to prove that the defendant made the so-called incriminatory remarks mentioned. It merely tended to prove that John Willis had made statements out of court inconsistent with and contradictory to his testimony given at the trial. The state, however, seems to mainly rely upon this evidence to show that the defendant feloniously took possession of the calf and appropriated it to his own use, knowing it to be the property of another. But, as we have stated, it does not

tend to establish that fact. All that can be claimed for it is that it tended to show, and the jury might well have concluded from it, that John Willis was an unreliable witness, and that his testimony was entitled to but little, if any, weight.

The rule is elementary that "what a witness, who is not a party, states out of court is not evidence in chief to prove the fact as stated by him, but can only be shown to discredit his testimony at the trial, when his testimony is contradicted by such outside statements. The effect of proving contradictory statements extends no further than the question of *credibility;* it does not tend to establish the *truth* of the matter embraced in the contradictory statements; it simply goes to the credibility of the witness." (1 Thompson on Trials (2 Ed.), sec. 492.) In 2 Chamberlayne's Modern Law of Evidence, sec. 1309, the author says:

"It will be further observed in this connection that in the case of a witness, who is not a party, the alleged inconsistent statement is merely destructive of the evidence given. It is without legal tendency to establish the proposition which the prior statement asserts."

In 10 Ency. Pl. & Pr. 281, it is said:

"A witness may be impeached by proof of verbal statements made by him out of court upon a material point, which are contradictory of his testimony on the trial, though *such statements are not admissible as independent evidence upon the merits.*" (Italics ours.)

The court did not give, nor was it requested to give, an instruction limiting the consideration by the jury of the evidence given by Henderson and Littlefield on rebuttal to the question of credibility of the witness John Willis. The jury, therefore, evidently considered their evidence on rebuttal, not only as bearing upon the question of the weight that should be given to the testimony of Willis, but as proof that the defendant actually made the alleged incriminating remarks referred to, and that those remarks were sufficient to show a criminal intent on the part of de-

fendant to commit the crime charged in the information. Upon no other theory can we account for the verdict of the jury in this case. The failure of the court to limit the consideration of the impeaching testimony by the jury to the purpose for which it was evidently introduced, and the only purpose for which it was admissible, namely, as affecting the credibility of the witness John Willis, is not assigned as error. In fact, error could not be predicated upon the failure of the court to so instruct the jury, because no such instruction was requested by the defendant. In determining the question presented by the assignment of error challenging the sufficiency of the evidence to justify the verdict, we can give effect to such evidence only as bears in some degree upon the issues involving the merits of the case. (*State v. Hansen*, 40 Utah, 418, 122 Pac. 375.) We have examined the record of the case with more than ordinary care, and we are forced to the conclusion that the evidence, when considered in the light most unfavorable to the defendant, does not justify an inference that the defendant knew, or had reason to believe, at the time he branded the calf in question, that it was not his property. In fact, his entire course of conduct, so far as disclosed by the evidence, from the time he took actual possession of the calf until he was tried and convicted, was not only consistent with the theory of innocence, but inconsistent with the theory of guilt. We think the facts in this case bring it within the principle involved in the case of *State v. Potello*, 40 Utah, 56, 119 Pac. 1023, and upon which that case was ruled.

There are several other errors assigned; but, as they are without merit, we shall not discuss them.

The judgment is reversed, and the cause remanded, with directions to the trial court to grant a new trial.

FRICK, C. J., and STRAUP, J., concur.