Gary OLIVERSON, Plaintiff,

v.

WEST VALLEY CITY, a governmental entity of the State of Utah and a body politic; David Campbell, former Chief of Police, West Valley City; Guy Kimball, Chair, West Valley City Civil Service Commission; Cathryn Weeks, member, West Valley City Civil Service Commission; Don Meyers, member, West Valley City Civil Service Commission; Clyde Palmer, Director, Utah Peace Officers Standards & Training (POST); and David L. Wilkinson, Attorney General of the State of Utah, Defendants.

No. 88–C–0863–S.

United States District Court, D. Utah, Central Division.

Jan. 10, 1995.

Gary L. Johnson, Richards, Brandt, Miller & Nelson, Brian M. Barnard, Utah Legal Clinic, Salt Lake City, Utah, for plaintiff.

Reed M. Stringham III, Utah Atty. Gen., Salt Lake City, Utah, Paul T. Morris, West Valley City Attorney's Office, West Valley City, Utah, Paul M. Tinker, Allan L. Larson, Snow, Christensen & Martineau, Salt Lake City, Utah, for defendants.

## ORDER

SAM, District Judge.

■ This case is now before the court for consideration of the magistrate judge's Report and Recommendation regarding the constitutionality of the Utah adultery statute, Utah Code Ann. 76–7–103. The magistrate judge recommends that summary judgment be entered in favor of defendants on this, the only issue remaining in the case. Plaintiff has filed a general objection only to the Report and Recommendation. Plaintiff's objection does not comply with the requirement that all objections to a magistrate judge's recommendations be specific in nature. Fed. R.Civ.P. 72(b). "The rationale for requiring proper objections is to shift some of the court's workload from the district court judges to the magistrate judges. A litigant who objects only in vague or general terms to the magistrate's recommendation forces the district court judge to review the entire case fully, frustrating the purposes of the Federal Magistrate's Act." *Keeler v. Pea,* 782 F.Supp. 42, 44 (D.S.C.1992). By citing only to the briefs submitted to the magistrate judge, plaintiff has failed to consider the specifics of the magistrate judge's reasoning, and has therefore failed to make any meaningful objection to this court.

The court, having now reviewed the entire record before it, finds the magistrate judge's Report and Recommendation to be a thorough and comprehensive review of the applicable law as it relates to the issue before the court. The court finds the Report and Recommendation to be well reasoned and correct in every respect. It is apparent that even the most recent case law on this issue belies the notion that the Constitution precludes reasonable state regulation of sexual behav-

ior. *See, e.g., United States v. Gates,* 40 M.J. 354 (CMA 1994) (upholding military regulation prohibiting consensual heterosexual sodomy). Accordingly, the court adopts the magistrate judge's Report and Recommendation as its own. Summary judgment is hereby GRANTED with regard to all defendants, and plaintiff's motion for summary judgment is DENIED.

## REPORT AND RECOMMENDATION

BOYCE, United States District Judge.

The plaintiff, Gary Oliverson, a police officer employed by West Valley City, Utah filed the instant suit under 28 U.S.C. § 1343 and § 1344 and 42 U.S.C. § 1983 against West Valley City and various officials of the City as well as against the Attorney General of the State of Utah and the Director of Utah Peace Officer Standards and Training (P.O.S.T.). Plaintiff challenged the constitutionality of the Utah fornication (Utah Code Ann. § 76–7–104), sodomy (Utah Code Ann. § 76–5–403) and adultery (Utah Code Ann. § 76–7–103) statutes. Defendants alleged plaintiff had violated the Utah statutes and that defendant Campbell, former Chief of Police of West Valley City, imposed sanctions against him for such conduct. An appeal by plaintiff, of the sanctions, was taken to the City Civil Service Commission and the sanctions generally upheld. Further sanctions were imposed on plaintiff by P.O.S.T. Plaintiff challenges the sanctions based on a claim of unconstitutionality of the Utah statutes. Plaintiff seeks injunctive relief from future enforcement of the mentioned statutes and removal of the disciplinary sanctions and references in P.O.S.T. certification records. Motions for summary judgment and partial summary judgment were made by the parties. Extensive briefing was submitted.

The magistrate judge made a report and recommendation (File Entry # 74) as to the fornication and sodomy issues. The report concluded plaintiff had no standing on the fornication issue and that the fornication issue was not ripe for determination. The plaintiff was married at the time of his alleged misconduct and no fornication was shown to have been committed. As to the sodomy issue, it was concluded that the Utah sodomy statute could be applied to plaintiff for his extramarital sodomy and misconduct with other women but that as to other hypothetical circumstances the plaintiff "had no standing" to make a constitutional challenge as to the possible hypothetical applications of the Utah sodomy statute. The constitutionality of the Utah adultery statute was reserved for further consideration. The district court upheld the report and recommendation of the magistrate judge as to the fornication and sodomy issues.

The plaintiff has now made a motion for partial summary judgment as to the Utah adultery statute (Utah Code Ann. § 76–7–103) (File Entry # 87). The plaintiff contends the statute offends his right to privacy, and violates substantive due process of law under the United States Constitution. The plaintiff also makes a "free expression" argument and a claim of overbreadth of the adultery statute in relationship to that contention. Equal protection has also been argued as a basis for relief. A memorandum in support of the motion was submitted (File Entry # 88). Plaintiff also submitted exhibits in support of the motion (File Entry # 92). The Utah State defendants (P.O.S.T. and the Attorney General) filed a responsive memorandum to the plaintiff's motion for partial summary judgment (File Entry # 93). The West Valley City defendants filed a response in opposition to plaintiff's motion for summary judgment. The West Valley City defendants also made a cross motion for summary judgment (File Entry # 97). Plaintiff filed a response to the State of Utah defendants' response (File Entry # 98). In these responses, plaintiff made the argument that he could be guilty of fornication if, as a married man, he had intercourse with an unmarried female by aiding and abetting the woman's fornication. The magistrate judge made a report and recommendation rejecting the claim and again concluding the plaintiff's constitutional challenge to the Utah fornication statute was not ripe for determination. The district court rejected plaintiff's claim.

Since the magistrate judge's prior reports and recommendations on the plaintiff's challenge to the Utah fornication and sodomy statutes have been accepted (File Entry

# 108), the issue of the constitutionality of the Utah adultery statute remains as the only issue for this court to resolve.

The case was referred to the magistrate judge under 28 U.S.C. 636(b)(1)(B). This report and recommendation is submitted on motions for summary judgment of plaintiff and the West Valley City defendants on the constitutionality of the Utah adultery statute, Utah Code Ann. § 76–7–103.

## FACTS

The plaintiff was a West Valley City police officer during times relevant to this action. The plaintiff, while married, had sexual relations with a woman or women not his wife. The relations included sexual intercourse and sodomy. As part of the relief plaintiff seeks, he asks this court to order removal from his employment file all the references to charges, discipline, or suspension that resulted in part from a violation of the Utah adultery statute. Plaintiff has since divorced the woman to whom he was married at the time. Plaintiff alleges the sexual acts were performed in private, were consensual, non-prostitutional or commercial and heterosexual. The female participant was an unmarried adult. The conduct occurred during non-duty hours. Plaintiff was, as a result of the conduct, suspended for thirty (30) days without pay by West Valley City and the suspension noted in plaintiff's employment file. The West Valley City Civil Service Commission upheld plaintiff's suspension. The plaintiff's P.O.S.T. certificate was revoked for forty (40) days based on a consent order. Plaintiff contends the adverse actions were in part the result of plaintiff's violation of the Utah adultery statute.

Plaintiff's exhibits in support of his motion for summary judgment (File Entry # 92) show that a P.O.S.T. administrative complaint (Exhibit A) was filed against plaintiff alleging that on September 11, 1986, while plaintiff was a certified peace officer, there occurred "sexual relations" with a female member of the West Valley City Police Explorer Post. The plaintiff admitted the sexual relations "while he was married to another person and while he was off-duty from his peace officer employment." Plaintiff engaged in sexual intercourse and oral sex. Plaintiff also admitted other sexual intercourse on other occasions with members of an Explorer Post. The P.O.S.T. complaint expressly referred to the conduct as being crimes and acts of "Adultery, a Class A misdemeanor" as well as the Law Enforcement Code of Ethics. The P.O.S.T. complaint also charged that the conduct violated Utah Code Ann. § 67–15–10.5(1)(c)(v), which sanctions "any conduct or pattern of conduct that would tend to disrupt, diminish or otherwise jeopardize public trust and fidelity in law enforcement."

A letter of September 29, 1986 from the West Valley City Chief of Police advised plaintiff of a thirty (30) day suspension for "violations of the law of the State of Utah" and "commission of any crime relating to public morals and decency or other laws involving moral turpitude" as among other reasons for the sanctions (Exhibit B, File Entry # 92). The disciplinary action was upheld by the West Valley City Civil Service Commission (Exhibit D).

The West Valley City Police Department sponsored an Explorer Post program (File Entry # 97) to aid the development of young people. The defendant, West Valley City, contends Oliverson's conduct, which was made public, severely damaged public confidence in the Department (File Entry # 97, ¶ 18). It is also asserted that disciplinary action would have been taken even if the [adultery] statute had not been on the books (*Id.* ¶ 19, Aff. of David C. Campbell). Based on these facts the plaintiff contends he has standing to challenge the constitutionality of the Utah adultery statute, Utah Code Ann. § 76–7–103 and is entitled to partial summary judgment to the effect that the statute is unconstitutional. The State defendants, (Attorney General and director of P.O.S.T.), oppose the motion and defendant West Valley City contends it is entitled to summary judgment on its cross motion. West Valley City and the state defendants both contend the plaintiff has no standing to challenge the constitutionality of the Utah adultery statute.

## STANDARD FOR SUMMARY JUDGMENT

The plaintiff's motion for summary judgment must establish that there are no con-

tested material issues of fact. Fed.R.Civ.P. 56(c); *Maughn v. S.W. Servicing, Inc.,* 758 F.2d 1381, 1387 (10th Cir.1985). If that is done, the defendants must then come forward to show there is a material issue of fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If no such evidence is presented and no material issue of fact exists, the court may proceed to decide the issue as a matter of law.

In this case, there does not appear to be any dispute as to a material issue of fact. There is, in the evidence presented by plaintiff and West Valley City, a dispute as to whether an attorney for West Valley City, Keith Stoney, made a statement as to whether West Valley City intended to prosecute Oliverson for sexual misconduct. This evidence is not material to the issues in this case. First, it has nothing to do with the constitutionality of the Utah adultery Statute. Second, because adultery was a "Class A" misdemeanor at the time of the offense, under Utah law West Valley City could not be the actual prosecuting authority.

In this case the issue of the constitutionality of the Utah adultery statute is exclusively an issue of law for the court.

### STANDING

 Standing is a concept that insures that a party has properly invoked the jurisdiction of a federal court. It is part of the constitutional requirement of a case or controversy. Art. III § 2 United States Constitution. If a party has standing on a contested issue, then generally there is a case or controversy within the meaning of Article III. A mere disagreement between the parties, no matter how strongly held, is not enough to confer standing to sue in federal court. *Diamond v. Charles,* 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). The facts of standing are determined by the facts existing when the challenge is made. *Yancy v. American Petrofina Inc.,* 768 F.2d 707 (5th Cir.1985). Citizens may not use the courts as forums for the resolution of constitutional questions that do not effect their individual rights or interests. *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The constitutional claim must be particularized to the party making the challenge *Warth v. Seldin,* 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975); *Schlesinger v. Reservists' Comm. to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); McCormack, *The Justifiability Myth and the Concept of Law,* 14 Hastings Const. L.Q. 595, 601 (1987). The matter in issue must be redressable by the judicial process. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Allied to the concept of standing is that of "ripeness." This concept asks whether there is a current controversy warranting judicial intervention. *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); *Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). *Poe* could favor defendants' argument if the Utah adultery statute had not been enforced for years and was not being enforced and this issue was not ripe for resolution. However, in this instance plaintiff was sanctioned based in part on the adultery statute. This is not like the hypothetical claims of plaintiff made relative to the Utah fornication and sodomy statutes. See *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); Little, *It's About Time: Unravelling Standing and Equitable Ripeness,* 41 Buff.L.Rev. 933 (1993). Standing is a threshold requirement for federal court action and requires the plaintiff to be within the zone of the protected interest. *Oklahoma Hospital Ass'n v. Oklahoma Pub. Co.,* 748 F.2d 1421 (10th Cir.1984). The plaintiff must show an injury in fact and an immediate personal stake in the outcome. *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *Gollust v. Mendell,* 501 U.S. 115, 111 S.Ct. 2173, 115 L.Ed.2d 109 (1991). The plaintiff can only seek redress as to his own rights. *U.S. Dept. of Labor v. Triplett,* 494 U.S. 715, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990) (attorney against whom a disciplinary proceeding was brought for allegedly collecting illegal fees in black lung

benefit cases had standing to challenge constitutionality of attorney fee provisions of the Black Lung Benefits Act).[1] The party making the complaint must have personally suffered some actual or threatened injury to his or her personal rights from the defendants' actions. *County of Riverside v. McLaughlin,* 500 U.S. 44, 51, 111 S.Ct. 1661, 1667, 114 L.Ed.2d 49 (1991) ("direct & current injury"); *Bell v. Little Axe Independent School Dist.,* 766 F.2d 1391 (10th Cir.1985); *Oklahoma Hospital Ass'n, supra; Housing Auth. of Kaw Tribe v. City of Ponca City,* 952 F.2d 1183 (10th Cir.1991); *Cooper v. State of Utah,* 684 F.Supp. 1060 (D.Utah 1987) (injury in fact); *Schaefer v. Wilcock,* 676 F.Supp. 1092 (D.Utah 1987). This is judged by the nature of the claims presented. *International Primate Protection League v. Administrators of Tulane Educational Fund,* 500 U.S. 72, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991) (party has standing to challenge a statute if the party has suffered injury that fairly can be traced to the challenged action and is likely to be redressed by the requested relief). Where criminal statutes are involved, the court will not consider extraordinary hypotheticals. *Diamond v. Charles, supra; United States v. Mendes,* 912 F.2d 434 (10th Cir.1990).

Recently, in *Lujan v. Defenders of Wildlife,* —— U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the court observed:

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized, see *id.* [468 U.S.], at 756, 104 S.Ct. at 3327; *Warth v. Seldin,* 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975); *Sierra Club v. Morton,* 405 U.S. 727, 740–741, n. 16, 92 S.Ct. 1361, 1368–1369, n. 16, 31 L.Ed.2d 636 (1972); and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" *Whitmore [v. Arkansas],* supra 495 U.S. [149], at 155,

110 S.Ct. [1717], at 1723 [109 L.Ed.2d 135 (1990) ] (quoting *Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)). Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

—— U.S. at ——, 112 S.Ct. at 2136.

■ Applying these standards to this case, it is apparent plaintiff has standing to contest the constitutionality of the Utah adultery statute because of the sanctions imposed on him, but not as to circumstances beyond the facts of his particular situation.[2] The facts involved with the plaintiff's conduct only fit under two Utah criminal statutes, adultery and sodomy. The P.O.S.T. complaint and findings as to plaintiff's conduct expressly referred to his actions as constituting adultery and constituting a "Class A" misdemeanor. Therefore, the Utah Criminal statute played a particular role, in part, in the determination of P.O.S.T. to impose sanctions.

West Valley City Chief of Police Campbell, in taking his action against plaintiff, referred to "violations" of the law of the State of Utah, thereby appearing to rely on the adultery offense. Further, Chief Campbell referred to "any crime" involving moral turpitude. It must be concluded that the fact that the plaintiff's conduct violated the Utah adultery statute was at least one substantial reason for the sanctions imposed by West Valley City. The City may have relied on other factors, but the sexual relations of plaintiff constituting adultery and being a violation of Utah state law appears to have been a factor

1. The Third party standing aspect of *Triplett* is not apropos to this case.

2. To the extent plaintiff seeks to assert standing on the basis of future actions, they are too speculative. The plaintiff, based on the current record, is not married, and whether he would engage in future adulterous acts is purely speculative. *Lyons, supra.*

in the sanctions imposed by the City. The contention that the action would have been taken if the adultery statute had not have been on the books is speculative and conclusory. Therefore, it is concluded plaintiff has standing to challenge the constitutionality of the Utah adultery statute based only on his conduct. *U.S. Dept. of Labor v. Triplett, supra; International Primate Protection League v. Administration of Tulane Educational Fund, supra; Lujan v. Defenders of Wildlife, supra.*

■ The plaintiff seeks to broaden his standing to include interpretations or applications of the Utah statute beyond his own conduct. The plaintiff contends the .Utah adultery statute is overbroad and violates First Amendment rights by prohibiting free expression. This argument is an effort to apply the statute to hypothetical situations not involving the plaintiff. It is contended sexual intercourse is "free expression" (File Entry # 88). The doctrine of overbreadth is an exception to the general rule of standing that a party may only assert the unconstitutionality of a statute as applied to the person's individual circumstances. *Massachusetts v. Oakes,* 491 U.S. 576, 109 S.Ct. 2633, 105 L.Ed.2d 493 (1989). However, the overbreadth doctrine is limited to areas involving the right of free speech. *Oakes, supra; Secretary of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Regan v. Time, Inc.,* 468 U.S. 641, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984); *Board of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987); *O'Connor v. City and County of Denver,* 894 F.2d 1210 (10th Cir.1990); *Foremaster v. City of St. George,* 882 F.2d 1485 (10th Cir.1989). However, the overbreadth challenge in the First Amendment sphere is also limited. In *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973) the Supreme Court said that:

[F]acial overbreadth adjudication is an exception to our traditional rules of practice and ... its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from "pure speech" toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.

*Id.*

It then stated:

[P]articularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.

*Id.*

"Pure speech" is the core of the standing issue under the overbreadth doctrine. Recently, in *Dodger's Bar & Grill v. Johnson County Bd. of County Comm'rs,* 32 F.3d 1436 (10th Cir.1994) the court held an exotic nude dancer had an insufficient speech interest associated with wearing scant clothing to invoke the overbreadth doctrine.

Plaintiffs also claim that the AEC will unconstitutionally restrict the attire of their patrons. But we find the reasoning of the Eleventh Circuit in *Geaneas v. Willets,* 911 F.2d 579 (11th Cir.1990), *cert. denied,* 499 U.S. 955 [111 S.Ct. 1431, 113 L.Ed.2d 484] (1991), persuasive in rejecting this overbreadth argument. Plaintiffs fail to demonstrate any First Amendment interest of either dancers or bar owners in allowing their patrons to wear revealing clothing. Further, because "the chilled expression—the conduct of wearing revealing clothing—rests at a pronounced distance from the 'pure speech'" at the core of the First Amendment, plaintiffs simply do not have standing to assert any rights to wear scant attire that patrons could possibly have in this setting.

*Id.* at 1443.

Consequently, plaintiff has no First Amendment right to challenge the Utah adultery statute as overbroad beyond the circumstances of plaintiff's own conduct for which he was sanctioned.

## CONSTITUTIONALITY OF THE UTAH ADULTERY STATUTE

### History

The offense of adultery was not a common law crime, under English law, but it was punished by the ecclesiastical courts which had adjunct authority to the common law courts. Rollia M. Perkins and Ronald N. Boyce, *Criminal Law*, 454 (3d ed. 1982); Honore, *Sex Law in England*, 28 (1978);[3] 4 William Blackstone, *Commentaries* 65. It was a crime in the British colonies, where ecclesiastical courts had no jurisdiction, and in the United States. Honoré, *supra*. The sexual penetration for adultery is defined the same as in rape. *Id.* at 27. As Honoré notes, "In many societies adultery is one of the most serious crimes, and often carries the death penalty." *Id.* at 28.[4] In Hebraic law the Seventh Commandment forbade adultery. Subsequent Hebraic codes also penalized adultery.[5] *Leviticus* 20:10 stated:

And the man that committeth adultery with another man's wife, even he that committeth adultery with his neighbor's wife, the adulterer and the adulteress shall surely be put to death.

Roman law also severely punished adultery. Code of Justinian, I. IX T.T.XI; Dig. 48. 5.14. See also Annette Lawson, *Adultery*, 41–42 (1988).[6] Article 118 of the *Argentine Penal Code* (1963) punished adultery: § 502 of the *Austrian Penal Code* (1911) punished adultery as a petty misdemeanor. Section 172 of the *German Penal Code of 1871* (1961) punished adultery and § 193 of the 1962 *German Penal Code* (Draft) punished adultery by one year penal custody. At one time Scotland imposed criminal sanctions for adultery. Gordon, *Criminal Law*, (Scot) 16 (1967). See also § 241, *Korean Penal Code*, (1960). Section 172 of the *Canadian Penal Code* imposes criminal sanctions for adulterous conduct that corrupts a child. In England,[7] Australia[8] and other common law countries adulterous conduct may be a basis for a claim of provocation to reduce murder to manslaughter, thereby giving some recognition to the concept that adulterous conduct can provoke an innocent spouse to act with sufficient heat of passion or emotional disturbance for such person to lose

3. Sodomy was punished in the ecclesiastical courts until the reformation when it was criminalized and punished in the King's courts. 25 Hen. VIII Ch. 6; Duncan, *Who Wants to Stop the Church: Homosexual Rights Legislation, Public Policy and Religious Freedom*, 69 Notre Dame L.Rev. 393, 445 (1994): *Homosexual Rights Legislation, Public Policy and Religious Freedom.* Obscenity was removed to the King's courts in 1663. Comment, 47 Ark.L.Rev. 393 (1994). The ecclesiastical court actually had substantial sanction jurisdiction. Comment, 16 Loyola L.A. Int'l & Comp.L.J. 9 (1993). English ecclesiastical courts performed many functions that are today processed in the courts of the sovereign. Charles Donahue, Jr., *Ius Commune, Canon Law, and Common Law in England*, 66 Tul.L.Rev. 1745 (1992). Although ecclesiastical in *status*, the courts often pursued matters that bore a substantial similarity to common law crimes. R.H. Helmholz, *The Early History of the Grand Jury and the Canon Law*, 50 Chi.L.Rev. 613 (1983) ("The third conclusion required by examination of the ex officio ecclesiastical procedure is that no strict boundary can be drawn between criminal prosecution and the law of crimes enforced in the canon law and those in the English common law courts even during the later Middle Ages." *Id.* at 627). Therefore, it would not be a proper conclusion to say that because the offense was sanctioned by the ecclesiastical courts, it was not related to a *malum in se* crime. Adultery has always been seriously regarded in English legal history. Jeremy D. Weinstein, *Adultery, Law and the State: A History*, 38 Hastings L.J. 195 (1986).

4. See Fenton Bresler, *Sex and The Law*, 157–159 (1988).

5. The codes are often referred to for their religious importance, however, in fact, in Hebraic history they were in part legal codes governing the social conduct of the societies to which they applied. The Biblical books are ancient legal codes and histories. It would be wrong to assume the Hebraic references are merely religious commands.

6. The law of Athens severely punished adultery. MacDowell, *The Law of Classical Athens*, 124 (1978). Adultery was recognized as an offense and severely sanctioned in primitive societies. Hartland, *Primitive Law* (1924) (as referenced).

7. *Holmes v. D.P.P.*, [1946] App.Cas. 588 at p. 598.

8. Howard, *Criminal Law* (Aust.) 4th Ed. at 83–87; Gillies, *Criminal Law* (Aust.), 349 (2d ed. 1990).

control and commit a violent act.[9] In France adultery that causes a homicide is a "crime passionnel" which may result in an acquittal on a homicide charge or a reduced sentence. Rowan, *Crime Passionnel,* Ch. 4, in *Famous European Crimes* (1956); Bresler, *supra,* Ch. 17. Adultery is a frequently prosecuted crime in Switzerland, Bresler, *supra.* at 157.

These employments of the criminal law to punish the practice of adultery support the conclusion that a wide variety of cultures and judicial systems have found adulterous conduct sufficiently injurious to justify some form of sanction and to be conduct which society was not only unwilling to approve but to attach an opprobrious criminal status. The American experience is somewhat different but historically there is even greater support for the criminalization of adulterous behavior. The *Laws and Liberties of Massachusetts,* 1658 5–6 (Leg. cl. ed. 1982) provided punishment of death for forms of adultery. Friedman, *Crime and Punishment in American History,* 13 (1993) observes that during the colonial period in the United States adultery was a crime "almost everywhere." Virginia law, Statutes of Virginia, Vol. 1 at 433 [Act II of March 1657–58] also punished adultery. Friedman, *supra* at 40 reflects New Hampshire's adultery statute in 1701 adultery included the sanction that required a person to sit with a hangman's noose around one's neck and to be "severely whipt." In the nineteenth century, criminal statutes against adultery were common. Friedman, *supra* at 127–128, citing Me.Rev. stat. (1847), at 685–86. From 1750 to 1796 4.3% of the criminal indictments were for sexual offenses including adultery. Friedman, *supra.* See Kealey, *Patterns of Punishment: Massachusetts in the Eighteenth Century,* 30 Am.J.Legis.Hist. 163, 169 (1986). Prosecutions for adultery in Marion County, Indiana were not unknown during the period from 1823–60, although not necessarily substantial. *Id.* at 129, 130. In the Ohio Courts of Common Pleas in 1875, there were 28 indictments for adultery. Using the fact of adultery as the unwritten law to excuse homicide also occurred in the United States. Friedman, *supra* at 221. See Criminal Laws of Texas, 1881 Art. 567 at 191. Rev.Stat. Utah 1898 § 4168(4); Cannon, *Mountain Common Law,* 51 Utah Hist.Q. 308 (1983). The unwritten law of justifiable homicide was actually written in Texas and in Utah. Friedman notes "In most states, adultery ... laws were still part of the penal code in 1900 ...." Friedman, *supra* at 332. Enforcement of adultery laws was significant in Massachusetts in the early twentieth century. *Id.* at 332.

In 1840 in *Commonwealth v. Elwell,* 2 Met. 190 (Mass. 1840) the venerable Chief Justice Shaw, speaking for the court, upheld an indictment for adultery charging both a married woman and an unmarried man. Both could be prosecuted for adultery. Certainly, adultery statutes and prosecutions under such provisions were common in the United States in the eighteenth and nineteenth centuries and at the time of the adopting of the Bill of Rights [10] as well as at the time of the approval of the Fourteenth Amendment.[11] See Hocheimer, *Criminal Law,* § 239 (2d ed. 1904); *Clark's Criminal Law,* § 125 at 312 (1894); *May's Criminal Law,* § 195 (2d ed. 1893).[12] There is no historical support for a contention that the framers of the Constitution or its relevant amendments would have intended the Bill of Rights or the Fourteenth Amendment to abrogate state adultery laws.

Since that time, most states have continued to maintain adultery statutes as a part of their criminal law. Clark and Marshal, *Crimes,* 767–769 (7th ed. 1967); Lawson, *supra,* at 42–43; Richard A. Posner, *Sex and Reason,* 78, 261; 38 *Hasting L.J.* 195 at

---

9. McLynn, *Crime & Punishment in Eighteenth Century England,* 37 (1989) states that "adultery was regarded as the worst possible kind of provocation." For ten years from 1650 adultery was a capital offense in England. *Id.* at 96.

10. The Bill of Rights was adopted in 1791.

11. The Fourteenth Amendment was adopted in 1868.

12. May defines adultery as "The unlawful and voluntary sexual intercourse between two persons of the opposite sexes, one at least of whom is married." This comports with Utah law.

*supra,* discussion at notes 230–235.[13] See Perkins and Boyce, *supra,* 454–55; Morosco, *The Prosecution and Defense of Sex Crimes,* § 6.02[2] [1994]; C. Torcia, *Wharton's Criminal Law,* 215 (14th ed. 1979). Prosecutions have decreased [14] but they are still reported in appellate cases and legislatures retain the offense in criminal codes. *Morosco, supra* at § 602[2]. The statutes vary from jurisdiction to jurisdiction. *Lawson, supra; Posner, supra, Morosco, supra.* Adultery is still recognized as a basis to reduce a homicide from murder to manslaughter in many jurisdictions. LaFave and Scott, *Substantive Criminal Law* § 710(b)(5) (1986); Perkins & Boyce, *supra* at 96–97.[15]

The *Model Penal Code, American Law Institute Commentaries* note on adultery and fornication observes "sexual intercourse out of wedlock is a crime in several American jurisdictions," *Commentaries* pt. II at 430 (1980). See also MPC § 207.1 at 204 (Tent. Draft No. 4 1955) noting that in 18 jurisdictions a single act of sexual intercourse between unmarried persons is punished as a crime.[16] "As of the date, simple adultery constituted a criminal offense in thirty states...." *Commentaries supra,* at 431. The statutes take various forms from state to state. Adultery has been punished as a felony in states other than Utah. Oklahoma punishes the offense by five years imprisonment. Okla.Stat.Ann. tit. 21, §§ 871, 872 (1983).[17] See also 2 C.J.S., *Adultery,* §§ 1–29 (1972); 2 Am.Jur.2d, *Adultery and Fornication,* § 1–11 (1994). The Model Penal Code Council voted to remove any offense of adultery from the MPC, See *Commentaries, supra* at 436, although the Advisory Committee had maintained an offense that would have covered some form of adulterous conduct. MPC § 207.1 (Tent.Draft No. 4, 1955). The reasons for the action of the MPC Council, *Commentaries,* at 436–38, are not without justification, however, the reasons are those of legislative choice [18] and not based on constitutional analysis.

## ADULTERY AS A CRIMINAL OFFENSE IN UTAH

Adultery was not a crime in Utah prior to 1887.[19] The reason might be assumed to be that to prosecute adultery would open the

---

**13.** Not all states are surveyed in the article. Utah's statute is not mentioned.

**14.** See *American Law Institute, Model Penal Code Commentaries* 434 (1980). Plaintiff challenges the law on its face. Selective enforcement is of course subject to constitutional limitations. *Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *United States v. Cook,* 949 F.2d 289, 292 (10th Cir.1991). Discriminatory enforcement is prohibited; selective enforcement is not necessarily inappropriate.

**15.** Until the adoption of the most recent Utah Criminal Code in 1973, Ch. 196, the killing by a husband of a wife's partner in adultery was justification for the homicide. See *supra* p. 1474.

**16.** The MPC commentary at times lumps fornication and adultery together as though they were of the same nature. This is not an accurate reflection of the law or the social consequences of the two. Courts have treated constitutional challenges to adultery differently than challenges to fornication. But see *State v. Saunders,* 75 N.J. 200, 381 A.2d 333 (1977) wherein the court spoke in broad and undiscriminating terms in adjudicating the constitutionality of the New Jersey fornication statute. The reasoning has been narrowed or rejected by the Supreme Court in *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986).

**17.** There seems to have been a significant number of case decisions in Oklahoma on the adultery offense. See Annotations to § 871. See also *Prosecution of Adultery and Bigamy in Oklahoma.* 14 Okl.L.Rev. 203 (1961). See most recently, the statement in *Copeland v. Stone,* 842 P.2d 754, 756 (Okl.1992).

**18.** The Model Penal Code is itself a legislative model. Although numerous states, including Utah, have patterned their Penal Codes on the MPC, no state has adopted the MPC verbatim.

**19.** The magistrate judge has been unable to effectively trace the Utah criminal law during the period of the pre-territorial government of the State of Deseret. Also, there has been no effort to resolve whether adulterous conduct was punished by the Mormon Bishop's courts which handled much legal business in Utah up to the 1870's. On the use of Bishop's courts, in early Utah see Firmage and Mangrum, *Zion In The Courts: A Legal History of the Church of Jesus Christ of Latter Day Saints, 1830–1900,* 263 *et seq.* (1988). Mormons were reluctant to use the territorial courts. Aaron, *Mormon Divorce and the Statute of 1852: Questions for Divorce in the 1980's,* 8 J.Contemp.L. 5 (1982).

door to criminal prosecution of polygamous relationships. This is exactly what occurred when Congress made adultery a crime in Utah by the Edmunds–Tucker Law "Anti–Polygamy Acts" of March 3, 1887; 24 Stat. 637. The Utah Territorial Legislature did not make adultery a crime until 1892, Laws of Utah 1892 ch. 7 § 5.[20] In *State v. Norman*, 16 Utah 457, 52 P. 986 (1898) the defendant was prosecuted and convicted of adultery. It was contended the territorial adultery law was invalid. The territorial law was the same as the Edmunds–Tucker Law.[21] The Utah Supreme Court upheld the validity of the territorial adultery law and the defendant's conviction. Chief Judge Zane dissented observing that Congress passed the first Utah adultery law in 1887 because the territorial legislature would not do so. 52 P. at 991. The Act of March 3, 1887 enacted by Congress (and the identical territorial statute) punished adultery as a felony (three years imprisonment). The man was guilty of adultery if he was married and had intercourse with an unmarried woman or if the man was unmarried and had intercourse with a married woman. The woman was only guilty of adultery if she was married and had a relationship with a man outside of marriage. A woman who was unmarried did not commit the offense of adultery by having intercourse with a married man. *Id.*[22] See Compiled Laws of Utah 1888 § 3 at 115.

The statute was retained in the Utah Criminal Code after statehood. Rev.Stat. Utah 1898 § 4210. It was readopted in subsequent codifications. Compiled Laws of Utah 1907 § 4210, Compiled Laws of Utah

1917 § 8088; Rev.Stat.Utah 1933 § 103–51–3; Utah Code Ann.1943 § 103–51–3. The offense was characterized as not being a continuing offense, but each act was a separate offense. *State v. Thompson*, 31 Utah 228, 87 P. 709 (1906).

A later general codification of Utah criminal law, Utah Code Ann. § 76–5–3 (1953) continued the Utah adultery statute in the same form as originally enacted by Congress during the territorial period. However, in 1973 when Utah abandoned the Field Code format for a criminal code and adopted a criminal code patterned on the Model Penal Code, the adultery statute was modified and made a class A misdemeanor. The current provision is found in the Utah Criminal Code chapter on offenses against the family (Utah Code Ann. tit. 76 ch. 7). Utah Code Ann. § 76–7–103 (1992) now provides:

(1). A married person commits adultery when he voluntarily has sexual intercourse with a person other than his spouse.

(2). Adultery is a class B misdemeanor.[23]

In 1991 the criminal penalty in the adultery statute was reduced from a class A misdemeanor to a Class B misdemeanor.[24] In 1971 the gender differentiation that discriminated against married men was eliminated. Any married person who has sexual intercourse with anyone other than the person's spouse is guilty of adultery.

The history of the enforcement of the Utah adultery law records a number of appellate decisions. *State v. Thompson, supra; State v. Greene*, 38 Utah 389, 115 P. 181 (1910);

---

20. The Church of Jesus Christ of Latter Day Saints (LDS Mormon) manifestos abolishing polygamy as a church practice were issued September 24, 1890 and became church doctrine October 6, 1890. The Territorial Act was apparently passed to meet conditions of the Utah Enabling Act to allow Utah to become a state. The whole sad chapter of the attack on polygamy and the "War against Mormon Society" is reported in Firmage and Mangrum, *supra* pt. II.

21. This should not be confused with the Edmunds Law approved March 22, 1882, in which Congress criminalized wrongful cohabitation.

22. A conviction for adultery under the 1887 act was set aside in *Ex parte Nielsen*, 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118 (1889) when the defendant had been convicted of wrongful cohabita-

tion for the same conduct. Wrongful cohabitation was made a crime by Congress in 1882 by the Edmunds Law. Prosecutions for both bigamy and adultery were upheld in *United States v. West*, 7 Utah 437, 27 P. 84 (1891).

23. The plaintiff challenged the law prior to the 1991 amendment. The change in 1991 is not significant to the resolution of the constitutional issues. It merely reduced the penalty for the offense.

24. 1991 Utah Laws ch. 241 § 95. This illustrates the continued Utah Legislative support for a criminal adultery statute as well as a conscious consideration of its retention.

*State v. Hansen*, 40 Utah 418, 122 P. 375 (1912); *State v. Sheffield*, 45 Utah 426, 146 P. 306 (1915); *State v. Odekirk*, 56 Utah 272, 190 P. 777 (1920); *State v. Anderton*, 69 Utah 53, 252 P. 280 (1926); *State v. Warner*, 79 Utah 500, 291 P. 307 (1930). See also *State v. Huntsman*, 115 Utah 283, 204 P.2d 448 (1949).[25]

It is apparent that in Utah there has been substantial congressional, territorial and state legislative support for the criminalization of adulterous conduct. Although Congressional action against adultery in the Utah Territory was aimed at polygamy, it is also difficult to see how polygamy prohibitions could withstand a constitutional challenge if adulterous conduct were a constitutional right.[26]

To declare adultery a constitutional right would therefore be a significant change in constitutional doctrine and *could* support the right to engage in polygamy.

### PRIVACY INTERESTS

The plaintiff contends the Utah adultery statute violates a privacy interest protected by the Fourteenth Amendment (File Entry # 88, at 10). The defendant refers to *Whalen v. Roe*, 429 U.S. 589, 598–600, 97 S.Ct. 869, 876–77, 51 L.Ed.2d 64 (1977), a decision on medical privacy, and contends the constitutional privacy right involves two interests: decision-making autonomy and freedom of disclosure. This general analysis may be correct, but both of these arguments fail in the adultery context. First, in *Whalen*, the decision-making autonomy right was the individual right to privacy with regard to records of certain prescription drugs and the Supreme Court upheld the requirement of a New York law that required providing the state with a copy of prescriptions written for certain drugs. The individual privacy inter-

est did not prevail. The case does not support the plaintiff, but supports the exercise of state police power. In the case of adultery, the decision to engage in the act must involve two persons. There is no individual autonomy. Further, even the right of privacy attendant to the decision to have an abortion is not absolute, but subject in certain contexts to state interests and requirements. *Planned Parenthood v. Casey*, —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). The freedom of disclosure is not involved in the act of adultery since the joint nature of the act inherently involves disclosure beyond one person. There is no marital union, no privacy protected by familial interests; indeed the act has for centuries been viewed as totally antithetical to the family. It is a physical sexual act involving two persons not having any obligation to each other. The Utah law does not compel disclosure of anything. It precludes the act in the first instance. The privacy is in conduct like that of deceit or theft and similar to that of conspiracy,[27] not that of a marriage relationship. See Lawson, *Adultery, supra*, ch. 1 "What is Adultery?" at 35–62. The author suggests a relationship between adultery and theft. It is suggested here that adultery is akin to a conspiratorial act in violation of the family.

In essence the plaintiff's claim of privacy is that the Constitution gives him an unfettered right as a married man to engage in sexual intercourse outside of his marital relationship. The Fourth Amendment clearly protects privacy interests. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), but only from "unreasonable" intrusion. The Constitution itself does not mention any right of privacy and no general right to privacy exists under the constitution, *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), and must be found im-

25. The compilation of cases is not exhaustive but intended to be illustrative and corroborative of the active use of the statute to punish adulterous conduct.

26. See Posner, *Sex and Reason, supra*, at 253 *et seq.* Polygamy prohibitions were held to be constitutional in *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878). See most recently *Potter v. Murray City*, 585 F.Supp. 1126 (D.Utah 1984), *aff'd*, 760 F.2d 1065 (10th Cir.1985). Pos-

ner, *supra*, observes that polygamy undermines compassionate marriage. The same is arguably true of adultery.

27. The criminal law has recognized that adultery is inherently conspiratorial since under "Wharton's Rule" adulterers cannot be convicted of adultery and conspiracy. An adulterous liaison is a conspiracy. Perkins & Boyce, *supra* at 689.

plicit in Constitutional provisions. Generally, privacy interests are protected by state tort law.[28] The constitutional analysis of a privacy right is a delicate one. In Schneider, *State Interest Analysis in Fourteenth Amendment Privacy Law: An Essay on Constitutionalization of Social Issues,* 57 Law & Contemp.Probs. 79, 81 (1988) it is observed, "Constitutional privacy has an artificial meaning most easily understood by looking at the specific rights it has been held to encompass." Most of the privacy right concepts under the Fourteenth Amendment have developed through family and reproductive rights cases. *Id.; Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973); "[T]he right has some extension to marriage, procreation, contraception, family relationship, and child rearing and education."[29] *Roe,* 410 U.S. at 152–53, 93 S.Ct. at 726 (citations omitted). See *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Carey v. Population Serv. Int'l,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Planned Parenthood v. Danforth,* 428 U.S. 52, 72–75, 96 S.Ct. 2831, 2842–44, 49 L.Ed.2d 788 (1976); *Webster v. Reproductive Health Serv.,* 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989); *Planned Parenthood v. Casey, supra.* See also *Mills v. Rogers,* 457 U.S. 291, 294 n. 3, 295 n. 6, 297 n. 10, 102 S.Ct. 2442, 2446 n. 3, 2446 n. 6, 2447 n. 10, 73 L.Ed.2d 16 (1982) (privacy right to bodily integrity is in the due process clause). However, privacy interests have not been extended to matters that only involve a mere subjective interest that is not one that society would consider, objectively, as warranting protection. *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986); *Katz v. United States, supra.* It has been said "privacy is a 'greedy' concept whose core principle seems endlessly expansive." *Schneider, supra,* at 87; Freund, *Privacy, in Privacy* NOMOS XIII (1971). The right to privacy has been limited to specific areas and matters warranting special protection. Even in areas where privacy is protected, not all aspects of a relationship are free from state intrusion or regulation. In *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) the Court recognized a constitutional protection in the right to marry, but observed:

> By reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed.

*Id.* at 386, 98 S.Ct. at 681.

To some extent balancing is essential. Modern life is urbanized and communal and requires restriction of some individual interests in order for all citizens to be able to enjoy a reasonable life. Harmony dictates some limitation on individual interests. An absolute right of privacy would be a form of anarchy. The privacy interest to be protected, therefore, must be significant if not fundamental. Further, the privacy interest must be balanced against public interest. *Cf. The Florida Star v. B.J.F.,* 491 U.S. 524, 530, 109 S.Ct. 2603, 2607, 105 L.Ed.2d 443 (1989).

It would appear the right of privacy as constitutional doctrine is a narrow concept still in the process of doctrinal evolution. In this circuit it has been recognized as a part of the right of familial association. *Griffin v. Strong,* 983 F.2d 1544 (10th Cir.1993). The court in *Griffin* said the intimate association-

---

**28.** See generally, Hofstrader & Horowitz, *The Right of Privacy,* (1964).

**29.** The Court in *Roe* noted that the "roots" of the right of privacy could be found in the First Amendment, *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969); the Fourth and Fifth Amendments, *Terry v. Ohio,* 392 U.S. 1, 8–9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968); *Katz v. United States,* 389 U.S. 347, 350, 88 S.Ct. 507, 510–11, 19 L.Ed.2d 576 (1967); in the penumbras of the Bill of Rights, *Griswold v. Connecticut,* 381 U.S. 479, 484–85, 85 S.Ct. 1678, 1681–82, 14 L.Ed.2d 510 (1965); in the Ninth Amendment, *id.* at 486, 85 S.Ct. at 1683 (Goldberg, J., concurring); and in the Fourteenth Amendment concept of personal liberty, *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). *Roe v. Wade,* 410 U.S. at 152, 93 S.Ct. at 726.

al right is not absolute under the substantive due process standards of the Fourteenth Amendment. It found no violation of any privacy right from an investigation of the plaintiff as to potential sexual abuse of children. The investigation was to protect familial interests. Laws against adultery are aimed at protecting a similar interest.

In *Jolivet v. DeLand,* 966 F.2d 573 (10th Cir.1992) the court recognized a privacy interest in a prison inmate not to have his private mail shown to other persons. In *Flanagan v. Munger,* 890 F.2d 1557 (10th Cir.1989) a claim of a violation of police officers' right of privacy was made based on an allegation that the release to the media of reprimands issued against the officers offended their privacy interests. The court acknowledged a protected privacy interest against disclosure to the public of private matter. The court said the privacy interest, if any, was protected under the due process clause. *Id.* at 1570 n. 15. It found no privacy interest because the subject matter pertained to the contents of police personnel files. *Id.* See also *Paul v. Davis,* supra. In *Walters v. Western State Hosp.,* 864 F.2d 695 (10th Cir.1988) the court recognized a right of privacy of a hospitalized mental patient to avoid psychotropic medication in certain circumstances. *Id.* at 698; see also *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984). A right of privacy in one's medical condition was acknowledged in *A.L.A. v. West Valley City,* 26 F.3d 989 (10th Cir.1994). See also *Lankford v. City of Hobart,* 27 F.3d 477 (10th Cir.1994). These cases deal with improper disclosure.

In *Eastwood v. Department of Corrections,* 846 F.2d 627 (10th Cir.1988) the court referred to a penumbra of provisions in the Bill of Rights as supporting a citizen's right of privacy. First, a privacy interest was recognized in avoiding disclosure of personal matters and the interest in being independent when making some kinds of personal decisions. *Id.* at 630. The court found a privacy right in not being forced to disclose private sexual matters.

 None of the cases from the Tenth Circuit support recognition of a privacy right to an adulterous relationship. The privacy interests protected by the Supreme Court and other federal courts' cases are inapposite to the conduct associated with adultery. In *Potter v. Murray City,* 760 F.2d at 1070 the court rejected polygamy as a protected privacy right and found no authority for such an extension. The court cited to *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 68, 93 S.Ct. 2628, 2641, 37 L.Ed.2d 446 (1973). In that case the Supreme Court said:

Finally, petitioners argue that conduct which directly involves "consenting adults" only has, for that sole reason, a special claim to constitutional protection. Our Constitution establishes a broad range of conditions on the exercise of power by the States, but for us to say that our Constitution incorporates the proposition that conduct involving consenting adults only is always beyond state regulation is a step we are unable to take.

*Id.*

In a note to the opinion the court cited to many instances where activity between consenting adults was outside of constitutional protection *e.g.,* "bigamy." The court cited to *Caminetti v. United States,* 242 U.S. 470, 484–487, 491–492, 37 S.Ct. 192, 194–95, 197, 61 L.Ed. 442 (1917) prohibiting transportation of a woman across a state line for "immoral purposes" under the language of the then Mann Act. See 18 U.S.C. § 2421 (Under the statute interstate transportation into Utah for purposes of adultery is prohibited). See also *Cleveland v. United States,* 146 F.2d 730 (10th Cir.1945), *rev'd on other grounds sub nom. Chatwin v. United States,* 326 U.S. 455, 66 S.Ct. 233, 90 L.Ed. 198 (1946).

The Supreme Court has recognized other areas of privacy protected by the Constitution. The right of association in the context of political activities is protected. *Buckley v. Valeo,* 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Brown v. Socialist Workers '74 Campaign Comm.,* 459 U.S. 87, 94, 103 S.Ct. 416, 421, 74 L.Ed.2d 250 (1982). The Court has also recognized a privacy interest in association in family living circumstances against arbitrary government restrictions. *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932,

52 L.Ed.2d 531 (1977) (arbitrary definition of "family" in one-family residence zoning ordinance held unconstitutional). But see *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (non-arbitrary definition of one-family dwelling, not restricting relatives, is constitutional).

An examination of these decisions shows no support for a conclusion of a constitutional right in plaintiff to engage in adulterous conduct. The decisions of the Supreme Court and other courts on privacy are narrowly drawn to protect fundamental or historical interests of personal privacy. Extramarital sexual relationships are not within the penumbra of the various constitutional provisions or the articulated privacy interests protected by the Constitution.

The plaintiff refers to the contraception cases in support of a claim of a due process privacy right to commit adultery. In *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) a challenge was brought to Connecticut statutes which prohibited the use of contraceptives and the giving of medical advice on their use. The court dismissed the appeal finding no case or controversy. Justice Harlan, dissenting, observed as to the right of family privacy:

> "[T]he family is not beyond regulation," *Prince v. Commonwealth of Massachusetts* [321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) ], *supra*, and it would be an absurdity to suggest either that offenses may not be committed in the bosom of the family or that the home can be made a sanctuary for crime. The right of privacy most manifestly is not an absolute. Thus, I would not suggest that adultery, homosexuality, fornication and incest are immune from criminal enquiry, however privately practiced. So much has been explicitly recognized in acknowledging the State's rightful concern for its people's moral welfare.

367 U.S. at 552–53, 81 S.Ct. at 1782 (Harlan J., dissenting).

The dissent eventually prevailed a few years later in *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The opinion of Harlan, J., drew a sharp distinction between family privacy and adulterous conduct.

In *Griswold, supra*, the court held the Connecticut statute forbidding the use of contraceptives violated the right of marital privacy within the penumbra of specific guarantees of the Bill of Rights. The court referred to the sanctity of the "marital bedroom," *id.* at 485, 85 S.Ct. at 1682, and "notions of privacy surrounding the marriage relationship." *Id.* at 486, 85 S.Ct. at 1682. Nothing suggests the privacy interest recognized in Griswold could encompass a right to a sexual relationship outside of marriage or one contrary to marital integrity. No right to perform an act of marital infidelity was even alluded to in the majority opinion. Justice Goldberg, Chief Justice Warren, and Justice Brennan concurred. In that opinion the justices said:

> The State, at most, argues that there is some rational relation between this statute and what is admittedly a legitimate subject of state concern—the discouraging of extra-marital relations. It says that preventing the use of birth-control devices by married persons helps prevent the indulgence by some in such extra-marital relations. The rationality of this justification is dubious, particularly in light of the admitted widespread availability to all persons in the State of Connecticut, unmarried as well as married, of birth-control devices for the prevention of disease, as distinguished from the prevention of conception, see *Tileston v. Ullman*, 129 Conn. 84, 26 A.2d 582 [ (1942) ]. But, in any event, it is clear that the state interest in safeguarding marital fidelity can be served by a more discriminately tailored statute, which does not, like the present one, sweep unnecessarily broadly, reaching far beyond the evil sought to be dealt with and intruding upon the privacy of all married couples. See *Aptheker v. Secretary of State*, 378 U.S. 500, 514 [84 S.Ct. 1659, 1668, 12 L.Ed.2d 992 (1964) ]; *NAACP v. State of Alabama*, 377 U.S. 288, 307–308 [84 S.Ct. 1302, 1314, 12 L.Ed.2d 325 (1964) ]; *McLaughlin v. State of Florida*, supra, 379 U.S. [184] at 196 [85 S.Ct. 283, 290–291, 13 L.Ed.2d 222 (1964) ]. Here, as elsewhere, "[p]recision of regulation must be the touchstone in an

area so closely touching our most precious freedoms."

381 U.S. at 498, 85 S.Ct. at 1689 (Goldberg, J., concurring).

The opinion went on to state:

Finally, it should be said of the Court's holding today that it in no way interferes with a State's proper regulation of sexual promiscuity or misconduct. As my Brother Harlan so well stated in his dissenting opinion in *Poe v. Ullman, supra* [367 U.S.] at 553 [81 S.Ct. at 1782]. "Adultery, homosexuality and the like are sexual intimacies which the State forbids ... but the intimacy of husband and wife is necessarily an essential and accepted feature of the institution of marriage, an institution which the State not only must allow, but which always and in every age it has fostered and protected. It is one thing when the State exerts its power either to forbid extra-marital sexuality ... or to say who may marry, but it is quite another when, having acknowledged a marriage and the intimacies inherent in it, it undertakes to regulate by means of the criminal law the details of that intimacy."

*Id.* at 498–99, 85 S.Ct. at 1689.

There is nothing in the constitutional doctrine of *Griswold* that can justifiably extend to protect adultery as a citizen's right.

Subsequently, in *Eisenstadt v. Baird, supra,* the defendant challenged his conviction under Massachusetts law for providing a woman with contraceptive foam. The state law only allowed married persons to receive such items under restricted circumstances. The plurality opinion said the statute denied equal protection because of the different treatment between married and unmarried persons.[30] The Court of Appeals had said the statute was not a health measure. The plurality said deterrence of fornication was not the law's purpose because it was riddled with exceptions for premarital use. If protection of health were involved the law was unjustifiably discriminating. The law could not be upheld as a general prohibition against contraception. At one point the plurality opinion noted the statute had "a dubious relation to the State's criminal prohibition on fornication." 405 U.S. at 449, 92 S.Ct. at 1036. The opinion did not suggest the State's fornication statute was unconstitutional and that, therefore, there was a right of access to the contraceptives. The opinion referring to *Griswold* did observe that, "If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from *unwarranted* governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Id.* at 453, 92 S.Ct. at 1038 (Second emphasis added). The key here is *"unwarranted"* intrusion. Some intrusion in this area has been recognized as later cases have allowed. *Casey v. Planned Parenthood, supra; H.L. v. Matheson,* 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981); *Ohio v. Akron Center for Reproductive Health,* 497 U.S. 502, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990). See also *Webster, supra.* This language will not support a conclusion that a person has a right to extramarital intercourse under the power to control one's procreation. Such an argument is a non-sequitur. It is the unwarranted governmental intrusion into prevention of pregnancy that the person has a claim to avoid. *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).[31] There is no argument in *Baird* that a person has a right to adultery, but rather the use of contraception cannot be arbitrarily denied. The case does not support the plaintiff's contention of a privacy right for a married person to engage in extramarital sex. Finally, *Baird* does not invoke a due process analysis considering privacy but one of equal protection of the law.

In *Carey v. Population Services Int'l,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) the *Baird,* analysis was extended to minors. The court adopted the *Baird* observation that "sexual activity may not be deterred by increasing the hazards attendant

---

**30.** The Utah adultery statute contains no exceptions.

**31.** One does not have a complete right of privacy to obscene materials in one's home. See *Osborne v. Ohio,* 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990).

on it." 431 U.S. at 694, 97 S.Ct. at 2021. The court questioned whether limiting contraception would deter sexual behavior. 431 U.S. at 695, 97 S.Ct. at 2021. On the privacy interest the court referred only to the right of privacy interest in connection with the decision affecting procreation. The court cited to *Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), a case now overruled in part by *Webster* and *Casey, supra; Hodgson v. Minnesota*, 497 U.S. 417, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990). Again *Carey* does not support plaintiff's argument but remains short of the claims made for it by plaintiff. *Carey*, 431 U.S. at 688, 97 S.Ct. at 2017–18. In *Carey*, the court reserved the issue that plaintiff advances, but the court later closed the door on it.[32] Unfortunately, the analysis of constitutional law behind *Carey* and *Baird* is obscured by broad social and political comment not relevant to this case. It is, therefore, difficult to extrapolate from these cases to any firm resolution of the instant problem.

■ An examination of substantive due process concepts is helpful. When speaking of substantive due process the requirement is of a fundamental right. This involves only personal rights that can be deemed fundamental or implicit in the concept of ordered liberty or deeply rooted in the nation's history and tradition. *Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973); *Paris Adult Theatre I v. Slaton*, 413 U.S. at 65, 93 S.Ct. at 2639; *Moore v. East Cleveland, supra.* See also *Doyle v. Oklahoma Bar Ass'n*, 998 F.2d 1559, 1567 (10th Cir. 1993) (substantive due process relates to the "substantive liberties of the person"); *Griffen v. Strong, supra* (substantive due process does not protect every family relationship from interference).

■ Applying the above factors a substantive due process claim of a right to adultery must fail. The practice of adultery has never been seen as implicit in the concept of ordered liberty. The same is true of any claim that the "right" is deeply rooted in this nation's history or tradition. The historical development of the criminalization of adultery is directly opposite to any aspect of an historical right.

The claim of the right to commit adultery cannot be considered "fundamental." A similar claim was considered in *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). Defendant challenged the Georgia sodomy statute which punished an act of sodomy with another adult male. The Supreme Court upheld the constitutionality of the Georgia statute. The court found that there was no "fundamental right" to engage in homosexual sodomy. The court said the family and reproductive privacy cases did not confer a right of privacy to engage in sodomy. *Id.* at 190, 106 S.Ct. at 2843. The rights announced in *Carey v. Population Serv. Int'l, supra; Griswold v. Connecticut, supra; Eisenstadt v. Baird, supra;* and *Roe v. Wade, supra* did not bear "any resemblance to the claimed constitutional right" to engage in homosexual sodomy. *Bowers*, 478 U.S. at 190–91, 106 S.Ct. at 2844. "Moreover, any claim that these cases nevertheless stand for the proposition that any kind of private sexual conduct between consenting adults is constitutionally insulated from state proscription is unsupportable." *Id.* at 191, 106 S.Ct. at 2844. The court observed that the proscriptions against such conduct "have ancient roots." *Id.* at 192, 106 S.Ct. at 2844. The court cautioned that the judiciary "is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution."[33] *Id.* at 194, 106 S.Ct. at 2846. The court also rejected a claim for a different result when the act takes place in private. *Id.* at 195, 106 S.Ct. at 2846. The court concluded the asserted interest was not fundamental and the fact it may be based on

---

**32.** See *infra, Bowers v. Hardwick, supra.*

**33.** For these reasons academic expression of a socio/political position formed on loose constitutional expressions are no foundation for the plaintiff's claim. See *e.g.* Note *Constitutional Barriers to Civil and Criminal Restrictions on Pre- and Extramarital Sex* 104 Harv.L.Rev. 1660 (1991); Martin J. Seigel, *For Better or Worse: Adultery, Crime & the Constitution*, 30 J.Fam.L. 45 (1991).

notions of morality did not defeat constitutionality.

The law, however, is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the Due Process Clause, the courts will be very busy indeed.[34]

478 U.S. at 196, 106 S.Ct. at 2846.

Justice Burger, concurring, noted the question of the wisdom of such legislation was for the "legislative authority." *Id.* at 197, 106 S.Ct. at 2847. Therefore, it cannot be said there is a fundamental right for married persons to have sexual intercourse outside of the marital relationship. The concept of privacy as articulated in the decisions of the Supreme Court does not provide support for plaintiff's argument.[35]

This conclusion is also supported by lower state and federal court decisions that have focused more directly on the constitutionality of adultery legislation. In *Fugate v. Phoenix Civil Serv. Bd.*, 791 F.2d 736 (9th Cir.1986) the court held police officers who were suspended for having sex with women other than their wives were properly disciplined. The court held plaintiff officers had no right of privacy to engage in sexual intercourse with prostitutes while on duty.[36] The court found no support for a right of privacy claim in the decisions of the Supreme Court.[37] The court upheld the right of the city to impose disciplinary sanctions noting that:

The City has legitimate interests in maintaining the morale, integrity, and public acceptance of the police department, and in minimizing conflicts of interest and risks of blackmail.

791 F.2d at 741.

In a very persuasive analysis of the issues, now Chief Judge Wallace stated:

Thus, although an argument could be constructed from the contraceptive and abortion decisions to extend the right of privacy to consensual sexual activities, the Court has expressly refrained from this interpretation.[38]

791 F.2d at 743 (Wallace, J., concurring).

The position seems to be unchallengeable in light of the subsequent holding in *Bowers v. Hardwick*, supra.

A similar conclusion was reached in *Shawgo v. Spradlin*, 701 F.2d 470 (5th Cir.1983) (no privacy right in police officer to cohabit with a subordinate officer where prohibited by regulation). *Id.* at 482–83. In *Suddarth v. Slane*, 539 F.Supp. 612 (W.D.Va.1982) the court held a state trooper's adulterous conduct was not protected by the Fourteenth Amendment where West Virginia had a statute against adultery. *Id.* at 617 (citing federal cases). A similar result was reached in *Wilson v. Swing*, 463 F.Supp. 555, 563 (M.D.N.C.1978) (adultery not protected by privacy or right of association); *Jackson v. Howell*, 577 F.Supp. 47 (W.D.Mich.1983). In *Kraus v. Village of Barrington Hills*, 571 F.Supp. 538 (N.D.Ill.1982) the court observed that the "state may make adultery a criminal act without violating constitutional rights of

---

**34.** States have legitimate police power to apply restrictions to protect public morals. See *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). Law has always had a basis in morals and morality and these interests may be reinforced by the police power of the state. George, *Making Men Moral: Civil Liberties and Public Morality* (1993).

**35.** See Johnson, *Constitutional Privacy*, 13 Law & Phil. 161 (1994).

**36.** The duty or nonduty status would make no real difference in Utah given the adultery statute and the fact that police officers in Utah hold office not just employment. See Utah Code Ann. § 77–1a–1 *et seq.* Police officers, of course, may have some discretion in enforcement which is inherent in the function. An officer has no discretion as to the laws he or she will obey.

**37.** In *Thorne v. City of El Segundo*, 726 F.2d 459 (9th Cir.1983) the court held that a potential public employee could not be questioned about sexual practices in order to gain employment. The context of that decision is not involved in this case. But see *Hollenbaugh v. Carnegie Free Library*, 436 F.Supp. 1328 (W.D.Pa.1977), *aff'd*, 578 F.2d 1374 (3rd Cir.1978), *cert. denied*, 439 U.S. 1052, 99 S.Ct. 734, 58 L.Ed.2d 713 (1978).

**38.** Judge Wallace cited to Bruce C. Hafen, *The Constitutional Status of Marriage, Kinship, and Sexual Privacy—Balancing the Individual and Social Interests*, 81 Mich.L.Rev. 463, 538, 542–44 (1983) which had concluded that the Supreme Court has not recognized a right to sexual privacy outside of marriage.

**1484**

adulterers." See cases cited in Diane C. Sheiring, Annotation, *Sexual Misconduct or Irregularity as Amounting to "Conduct Unbecoming An Officer" Justifying Officer's Demotion, Removal or Suspension from Duty,* 9 A.L.R.4th 614 (1981).

Congress has made adultery a military crime, 10 U.S.C. §§ 933, 934. The offense is frequently presented in military courts. *United States v. Poole,* 39 MJ 819 (CMA 1994); *United States v. Robinson,* 39 MJ 88 (CMA 1994). See *United States v. Hickson,* 22 MJ 146 (CMA 1986) for the history of the offense in the military. In *United States v. Henderson,* 34 MJ 174 (CMA 1992) the court held consensual heterosexual fellatio that was punished under military law did not violate an accuser's right to privacy.

In *Allinder v. City of Homewood,* 254 Ala. 525, 49 So.2d 108, 114 (1950) the court held there was no constitutional objection to punishing a single act of adultery. In *State v. Ronek,* 176 N.W.2d 153 (Iowa 1970) the court said adultery was a crime against the public and the criminalization was a proper exercise of legislative authority. Also concluding that federal cases do not afford a right of privacy to engage in unrestricted sexual activity, see *Schochet v. State,* 75 Md.App. 314, 541 A.2d 183, 186–198 (1988) (private act of fellatio between unmarried heterosexual adults may be prohibited). See also *State v. Mueller,* 66 Haw. 616, 671 P.2d 1351 (1983).

In *Commonwealth v. Stowell,* 389 Mass. 171, 173, 449 N.E.2d 357 (1983) the defendant was convicted of adultery under a Massachusetts statute. He contended, like the defendant in this case, that the statute was unconstitutional on its face. It was contended the statute violated the fundamental right of privacy guaranteed by the United States Constitution. Id., 449 N.E.2d at 359. The court rejected the same arguments as advanced by plaintiff after careful analysis of the relevant federal precedent:

> Whatever the precise definition of the right of privacy and the scope of its protection of private sexual conduct, there is no fundamental personal privacy right implicit

in the concept of ordered liberty barring the prosecution of consenting adults committing adultery in private. Therefore, the statute is not unconstitutional on its face.

449 N.E.2d at 360.

 "Adultery is a transgression against the marriage relation which relation the law endeavors to protect...." 2 C.J.S. *Adultery,* § 4 at 610. An adulterous relationship imposes costs on the non-involved spouse. Posner, *supra,* at 184. Costs may also be incurred by the errant spouse. Emotional costs may be substantial. *Id.* at 185. It may lead to unwanted children and greater problems of child support. *Id.* at 185–86. It may also lead to the destruction of a family and even serious violence. A state also has an interest in preventing disease and adultery may be more deterrable than fornication. *Id.* at 330. The adulterer whose liaison produces offspring may not have a protectable interest in the child. Adultery does not guarantee special status towards a child produced from the liaison. See *Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). Adultery in the case of many will lead to divorce and breakup of a family unit as a positive social and economic unit and force in society. The results can be tragic and the social costs may impact innocent children and relatives.

Annette Lawson's major work in *Adultery, supra,* shows adultery to have serious and endangering social and psychological consequences. It is not a victimless crime. There can be substantial adverse social costs. The state has an interest in avoiding the deficits and damages of the adulterous affair. The fact that adultery may occur with some frequency[39] is no justification for a constitutional restriction on the criminalization of adultery any more than on embezzlement or numerous other violations of trust which frequently occur. What is perceived as acceptable sexual conduct may be a product of fashion and a temporary social phenomenon and may change from other circumstances just a few years before.[40]

---

**39.** See *supra* note 33.

**40.** See Edward O. Laumann et al., *The Social Organization of Sexuality: Sexual Practices in the United States,* (1994); Robert T. Michael et al.,

Whether under the circumstances a strict scrutiny or a rational basis standard applies for constitutional review is not material to the resolution of this issue. See *R.A.V. v. City of St. Paul,* — U.S. ——, ——, 112 S.Ct. 2538, 2554, 120 L.Ed.2d 305 (1992); *National Commodity and Barter Ass'n v. Archer,* 31 F.3d 1521 (10th Cir.1994); *Jantz v. Muci,* 976 F.2d 623, 629 (10th Cir.1992); Tribe, *American Constitutional Law* 1306–08, 1400–09 (2d ed. 1988) The State of Utah and the defendants have a compelling state interest in preventing adultery.

Law Professor Martha A. Fineman of Columbia University in *Our Sacred Institution: The Ideal of the Family in American Law and Society,* 1993 Utah L.Rev. 387 notes that in regulating intimacy, the norms of the nuclear family have been firmly supported by the law. *Id.* at 388–89. Professor Fineman notes changes that have taken place, but the "family as a legal, functional, and symbolic institution in America is based" on natural law. *Id.* at 403. It has "tremendous societal value which helps to explain why it alone continues to serve as the only legitimate referent for our political and public discussions about intimacy, sexuality, and morality, as well as defining for us what are appropriate 'family' policies and needed law reforms." *Id.* at 403. Therefore, if this is so, it is appropriate for a state legislature to criminalize adultery in support of legitimate family interests.

### EQUAL PROTECTION

█ Plaintiff contends the Utah adultery statute violates his right to equal protection of the laws under the Fourteenth Amendment. As noted before, plaintiff has no fundamental right to engage in adulterous conduct. The classification of adultery is not a suspect classification. Therefore, the only question is whether the classification of prohibited conduct under the Utah adultery statute, Utah Code Ann. § 76–7–103, is rationally based. *McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d

393 (1961); *Marshall v. United States,* 414 U.S. 417, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974); *United States v. Antelope,* 430 U.S. 641, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977); *Bowers v. Hardwick, supra; Dodger's Bar & Grill v. Johnson County Bd. of County Comm'rs, supra.* As noted before, there is an interest of the State of Utah in preventing adultery. Whether to use the criminal law to that end is a matter particularly within the legislative judgment as to whether it will accomplish the desired result. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Given the special interest of the state, it is rational to classify adultery as a crime. *Bowers v. Hardwick, supra; People v. Jose L.,* 99 Misc.2d 922, 417 N.Y.S.2d 655 (N.Y.Cty.1979); *Hollenbaugh v. Carnegie Free Library, supra.* There is no merit to plaintiff's equal protection argument.

### FREE SPEECH

█ The plaintiff contends that the Utah adultery statute infringes on plaintiff's First Amendment right of free expression and that he may challenge the statute as being overbroad (File Entry # 88, p. 17). Assuming that adultery does involve some aspect of speech, if so, it is minimal and does not involve "pure speech." Therefore, under *Broadrick v. Oklahoma, supra,* the plaintiff may only challenge the statute as it applies to him, that is an act of sexual intercourse of a married man with an unmarried woman not his wife.

█ Some conduct may involve speech. However, the conduct must be communicative or symbolic. *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) (display of red flag as opposition to organized government); *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (requirement to salute the flag forces citizen to "confess" their support). However, in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) the court refused to find a statute prohibiting the destruction or

*Sex in America: A Definitive Survey,* (1994), reported in Newsweek, October 17, 1994, at 70; *Sex in America,* U.S. News and World Report, October 17, 1994, at 74 ("Fidelity Reigns"); *Now*

for the Truth About Americans and Sex, Time, at 62, 64 October 17, 1994, at 62, 64 ("Adultery is the exception in America, not the rule.").

mutilation of a selective service card to infringe on free speech. The Supreme Court did not accept the position that such conduct was speech simply because the actor intended a message:

We cannot accept the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea.

391 U.S. at 376, 88 S.Ct. at 1678.

■ The conduct must be intended to communicate before a speech interest is involved. *Id.* at 376, 88 S.Ct. at 1678. Thus, an act of wearing an armband is conduct sending a message. *Tinker v. Des Moines Community School District,* 393 U.S. 503, 505–07, 89 S.Ct. 733, 735–36, 21 L.Ed.2d 731 (1969). The same is true as to burning a flag as a protest message. *Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); *United States v. Eichman,* 496 U.S. 310, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990). There must be a speech aspect to the conduct before it may claim First Amendment protection.

In *Madsen v. Women's Health Center Inc.,* —— U.S. ——, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) the court upheld the use of injunctive relief to control conduct associated with the exercise of speech. This would protect speech but disallow intrusive conduct unnecessary to effective speech.

■ The Utah adultery statute does not regulate any speech or expression. It prohibits only sexual intercourse. No speech communication between persons is prohibited. No caring caresses, statements of affection or sensual interest, or manifestations of pleasure are prohibited. The plaintiff's indication that the statement "I love you" may be barred is in error. The Utah law does not sanction words but only limits conduct. The plaintiff has offered absolutely no evidence that his sexual escapades were to communicate something. It appears it was simply to satisfy his sexual appetites. Therefore, no speech element is involved in this case. Plaintiff has not shown any speech as part of his conduct, but addresses the issue only hypothetically. As noted in *Broadrick, supra,* plaintiff has no standing to make such a claim. Penetration of the female sexual organ by the male organ is required for the crime, nothing else except the status of the parties is required to make out the offense. *State v. Warner,* 79 Utah 500, 291 P. 307, 309 (1930) ("[T]he essential features of carnal knowledge are the same in prosecutions for adultery as in prosecutions for rape...."); *Commonwealth v. Moon,* 151 Pa.Super, 555, 30 A.2d 704, 708 (1943); *Morosco, supra,* § 6.02[2] at 6–19; 2 C.J.S. *Adultery* § 5. Nothing else is prohibited. That was the act that was involved in this case. The Utah statute on its face reaches no farther. Therefore, plaintiff's First Amendment speech argument is without merit.

## CONCLUSION

The plaintiff has made a broad based challenge to the Utah adultery statute. The statute has a long history in Utah ever since Congress first imposed adultery legislation in the territory of Utah. Historically, adultery has been a widely denigrated act and punished by criminal sanction in many jurisdictions. Over fifty percent of the states in the United States still have adultery statutes in force.[41] Congress passed the first Utah adultery legislation contemporaneously with the Fourteenth Amendment. There is no historical basis for a conclusion of unconstitutionality of the Utah adultery statute. The decisions of the Supreme Court and lower state and federal courts do not support the plaintiff's claim of violation of privacy, speech, or equal protection. Finally, the plaintiff's position is not commensurate with constitutional legal doctrine. The Utah adultery statute Utah Code Ann. § 76–7–103 is constitutional. The sanctions imposed on plaintiff were proper. Whether adultery should be sanctioned by a state or criminalized is a judgment of the legislature. It is especially appropriate for the ballot box. If

---

41. In Fenton Bresler, *Sex and the Law* 156 (1988) the author notes "Most people will surely be surprised to learn that there are only five U.S. States ... in which adultery is *not* a crime."

This figure may not be completely accurate, but it shows the strong presence of adultery laws in the states.

the statute is discriminatorily enforced, other constitutional protections provide relief. However, often who is punished and who avoids criminal sanction is a matter of luck. See Kimberly D. Kessler, Comment, *The Role of Luck in the Criminal Law*, 142 U.Pa. L.Rev. 2183 (1994). The matter of the efficacy of the Utah adultery statute in curtailing adultery is a matter for the state, not for this court. Other issues on enforcement are not presented.

Therefore, the defendant West Valley City's motion for summary judgment should be granted and plaintiff's motion for summary judgment denied and plaintiff's claim for relief denied. The State defendants have not asked for summary judgment but the court should award such relief on its own. *Pueblo of Santa Ana v. Mountain States Tel. and Tel. Co.*, 734 F.2d 1402, 1408 (10th Cir. 1984).

Copies of the foregoing Report and Recommendation are being mailed to the parties who are hereby notified of their right to object to the same. The parties are further notified that they must file any objections to the Report and Recommendation within ten (10) days after receiving it. Failure to file objections may constitute a waiver of those objections on subsequent appellate review.

DATED this 10th day of November, 1994.